In re R. W. SOUTHWESTERN, INC., an Oklahoma corporation, Debtor,

The FIRST NATIONAL BANK & TRUST COMPANY OF OKLAHOMA CITY, Oklahoma, a national banking corporation, Plaintiff,

v.

R. W. SOUTHWESTERN, INC., an Oklahoma corporation, and Quail Creek Bank, N. A., a national banking corporation, Defendants.

Realty World Corporation, a foreign corporation, Cross-Defendant.

Bankruptcy No. Bk–81–02164.
Adv. No. 82–0141.

United States Bankruptcy Court, W. D. Oklahoma.

Sept. 29, 1982.

Kenneth I. Jones, Jr., Oklahoma City, Okl., for plaintiff First Nat. Bank & Trust Co. of Oklahoma.

Manville T. Buford, Oklahoma City, Okl. and John F. Percival, Norman, Okl., for defendant R. W. Southwestern, Inc.

Defendant Quail Creek Bank, N.A. made no appearance.

## FINDINGS, CONCLUSIONS AND JUDGMENT

### PRELIMINARY STATEMENT

DAVID KLINE, Bankruptcy Judge.

The captioned adversary proceedings came on for trial pursuant to regular setting. Cross-Defendant Realty World Corporation ("Realty World" or "RWC") appeared by counsel, Gary A. Bryant and moved dismissal of the cause as against it. The court then ruled that the presence of Realty World was neither necessary nor indispensable and upon counsel's waiver of attorneys fees and costs in RWC's appearance, dismissed the adversary proceedings as against Realty World Corporation. After a full evidential hearing the matter was taken under advisement with suggested findings and briefs directed.

### FINDINGS

1) At all times material to the Bank's claim, Southwestern held a license from Realty World for each of two (2) geographical regions: the first region encompassed the State of Oklahoma ("Region 125" or the "Oklahoma license"); the second geographical area encompassed the State of Arkansas and some ten counties of western Tennessee ("Region 139" or the "Arkansas license"). Each license authorized Southwestern to sell and service real estate franchises to and for brokers in the described region.

2) Sometime in early August, 1979, Southwestern made an application to the Bank for a loan of $50,000 for the purpose of operating capital. The loan application was denied on the basis that the financial information furnished the Bank reflected that Southwestern was undercapitalized.

3) Thereafter, the President of the Bank was contacted on behalf of Realty World and was asked to give favorable consideration to a $95,000 loan to Southwestern, the security of which would include RWC's corporate guaranty.

4) On August 30, 1979, the Bank, having received sufficient confirmation of RWC's offer of guaranty, funded the loan in the amount of $85,000. Southwestern executed and delivered a promissory note. The loan was extended from time to time, the last extension being made October 7, 1981.

5) Southwestern also executed and delivered to the Bank three (3) security agreements dated August 30, 1979. On September 7, 1979, the Bank filed a financing statement with the County Clerk of Oklahoma County, Oklahoma.

6) Thereafter Southwestern fell into financial default under the terms of the Realty World licenses and Southwestern sought purchasers for one or both of the RWC licenses. In September, 1981, Southwestern received and accepted an offer to sell the Region 139 (Arkansas and West Tennessee) license to a group of Arkansas residents.

7) On November 4, 1981, before the closing of the sale of Region 139 to the Arkansas purchasers, Realty World terminated the licenses to both the Oklahoma and the Arkansas/West Tennessee regions.

8) Unable to meet RWC requirements for revocation of the termination, Southwestern commenced proceedings under chapter 11 and filed adversary proceedings in this court against Realty World *inter alia* to reinstate the Oklahoma license and to recover the sale proceeds of the Arkansas license.

9) On May 11, 1982, the court announced its decision in case No. 82–0020, finding in substance, that Southwestern's licenses were justifiably terminated but that Southwestern was entitled to the benefit of the sale of the Arkansas license. The recovery of the sales proceeds, however, was made subject to an agreement between Southwestern and RWC wherein RWC could retain and apply a certain amount of the sale proceeds to Southwestern's debt.

10) The security agreements in question provide for a security interest in:

\* \* \* \* \* \*

" . . . [a]ll goods, chattels, accounts, contract rights, documents of title, instruments, chattel paper, general intangibles, and other items of personal property now owned and hereafter acquired by Debtor, wherever located, and used or useful in the ownership, operation, maintenance and management of R. W. SOUTHWESTERN, INC. dba REALTY WORLD OF OKLAHOMA . . . ."

\* \* \* \* \* \*

11) No financing statement was filed in the states of Arkansas and Tennessee.

12) The note originally taken by the Bank was on a form furnished and prepared by the Bank and contained two (2) locations upon which "collateral" was to be described. The first is a block entitled "COLLATERAL TYPE" in which was placed the words: "Accounts Receivable and Equipment". The second location is within the text of the note itself:

\* \* \* \* \* \*

Security Agreement dated August 30, 1979, *covering accounts receivable.*

Assignment and Security Agreement *Covering Rights Under Contracts dated August 30, 1979.*

Security Agreement dated August 30, 1979, *covering equipment.* [Emphasis added]

\* \* \* \* \* \*

13) The renewal note of September 1, 1980, is identical in its description of the collateral. Upon its renewal of April 10, 1981, the collateral description was expanded to reflect the corporate guaranty of Realty World. The entry "COLLATERAL TYPE" was changed to state the following: "Accounts Receivable & Equipment & Guaranty." The typed description of the collateral in the text of the note was revised to read as follows:

\* \* \* \* \* \*

Security Agreement dated August 30, 1979, *covering accounts receivable.*

Assignment and Security Agreement *covering Rights Under Contracts dated August 30, 1979.*

Security Agreement dated August 30, 1979, *covering equipment.*

Guaranty of John Lavery, Carl Wright and Realty World Corp. [Emphasis added]

\* \* \* \* \* \*

14) The loan officer assigned to the Southwestern account and who prepared the documentation for the loan, John Osborne, then a vice-president of the Bank, testified that while he was generally aware of the existence of the Realty World licenses, he had no specific personal intent to take the licenses as security on the $85,000 note. He further testified that if he had

intended to take the licenses as collateral, he would have prepared and executed a collateral agreement and taken the instruments into his possession in the same manner as he would where certificates of deposit or shares of stock are used as collateral. Moreover, Mr. Osborne testified that he selected the language used in the description of the collateral on the security agreements.

15) The licenses were never offered by Southwestern as collateral and were never discussed as potential security in either the initial application or the loan as funded.

16) The collateral recited in Mr. Osborne's official bank report to the bank file described the collateral as:

\*  \*  \*  \*  \*  \*

(1) Blanket Security agreement covering Equipment—Furniture/Fixtures    Total value of equipment stated at $41,979.00 which does not include leasehold improvements.

(2) Blanket security agreement covering Accounts Receivable—Valued at $62,001.00.

(3) Blanket Assignement [sic] of Contract Rights.  This assignment covers member brokers membership fees as well as future earnings which will result from Realty World's 6% income from each sale reported by member brokers.

(4) Oral guaranty of Thomason McKinnongiven [sic] to Dale Mitchell.

(5) Guaranty of Realty World National.

\*  \*  \*  \*  \*  \*

17) Mr. John Lavery, president of Southwestern, admitted the execution of the loan documents and the security agreements as a corporate officer.  He testified that each of the licenses issued by Realty World contain a provision which prohibit use of the licenses as collateral.  The specific language is as follows:

\*  \*  \*  \*  \*  \*

B.  Except as hereafter provided, no shareholder, without Realty World's prior written consent, shall, by operation of law or otherwise, sell, assign, transfer, convey, give away, pledge, mortgage, or otherwise encumber to any person, per-

sons, partnership, association or corporation, any interest in this Agreement, or any interest in the license granted hereby, or any interest in Licensee, nor offer, permit or suffer the same.  Any purported assignment or transfer not having the written consent of Realty World shall be null and void and shall constitute a default hereunder.

\*  \*  \*  \*  \*  \*

18) Mr. Lavery was aware of the limitations in the license at the time and did not intend the licenses as security.  Moreover, he neither offered nor was requested to obtain Realty World's permission for the conveyance of a security interest therein.

19) During the course of the loan, Southwestern operated three (3) offices: in Oklahoma City for the operation of the Oklahoma license and corporate headquarters; in Little Rock, Arkansas, for the operation of the Arkansas portion of Region 139; and in West Memphis, Tennessee, for the remaining portion of Region 139.  Each office operated independently, selling and servicing the broker accounts in the respective geographical region.

20) When Southwestern encountered financial difficulties and sought to sell one or more of the licenses issued by Realty World, shortly prior to the last renewal date, October 7, 1981, Southwestern entered into an agreement with some persons in Arkansas for the sale of the Region 139 license.  The sale price for the license was the sum of $200,000, payable as follows: $63,000 cash at time of closing;  a secured non-interest bearing promissory note in the amount of $40,000, amortized over five (5) years;  and a secured non-interest bearing note in the sum of $97,000 payable five (5) years from date of closing.

21) On October 6, 1981, Southwestern's President, John Lavery, met with the Bank's Vice President, Louis Wilken, concerning the renewal of the $85,000 loan and Southwestern's ability to repay it.  Mr. Lavery disclosed the proposed sale of the Arkansas license, the price and terms of sale, additional sums anticipated through

the sale of accounts receivable and office furniture/equipment, that the purchasers were from the State of Arkansas, that Realty World was serving as broker or intermediary of the sale and the proposed distribution of proceeds of the sale. Following the meeting and as a part of the process of renewing the note, Mr. Wilken prepared a memorandum to the Bank's file concerning the meeting.

22) In his report, Mr. Wilken indicated that the collateral for the loan consisted of "Furniture, fixtures, and accounts receivable." On a second occasion, Mr. Wilken stated:

\* \* \* \* \* \*

The note is secured by furniture, fixtures, equipment, accounts receivable, and the separate guaranty of Realty World Corporation, which is the parent organization.

\* \* \* \* \* \*

23) Mr. Lavery advised Mr. Wilken that Southwestern hoped to realize some $84,000 in cash from the sale of the Arkansas license, but the distribution of the cash was subject to Realty World approval and Southwestern had little to say about the distribution. Mr. Lavery hoped that Southwestern could pay the Bank the total sum of $16,000, representing $5,000 from the sale of the license and $11,000 from the separate sale of accounts receivable and tangible assets. The limitations upon Southwestern as to the distribution of the proceeds were fully understood by Mr. Wilken.

24) During the course of the conversation between the Bank and Southwestern, no mention was made of a claim of a security interest in the licenses by the Bank. At no time thereafter did the bank attempt to place Southwestern, Realty World or the proposed Arkansas purchasers on notice of a security interest. No financing statement reflecting a claimed security interest was ever filed in the State of Arkansas or Tennessee. No discussion of such a claim in the licenses was raised to Mr. Lavery by Mr. Wilken.

25) On May 11, 1982, this court announced its findings in Bk–82–0020, subject only to a preparation of a journal entry by the parties. The court concluded that the proceeds of the Arkansas license sale was made subject to an agreement between Southwestern and RWC as to the distribution of the sale proceeds. The court awarded RWC the sum of $23,000 of the cash down payment and 50% of the proceeds from the promissory notes. The court awarded Southwestern the sum of $43,000 and the remaining 50% of the promissory notes.

CONCLUSIONS

1) The court has jurisdiction and venue of the parties and subject matter.

2) Southwestern's debt to the Bank is uncontroverted. That the Bank also possesses a valid and enforceable security interest in *some* collateral is also undisputed.

■ 3) The Bank has the burden of proof on the issue of whether the Bank intended to receive and Southwestern intended to convey a security interest in the licenses, the Bank claiming that the property claimed in this suit is the property described in the security agreements. See *First National Bank v. Hicks,* (Ala.1969) applying Alabama law; *U. S. v. Mid-States Sales Co.,* 336 F.Supp. 1099 (D.C.Neb.1971) applying Nebraska law.

■ 4) Oklahoma law applies to the issues raised between the Bank and Southwestern as to the nature and extent of the security interest, if any, that the Bank has in the proceeds of sale of the licenses formerly held by Southwestern.

5) The Oklahoma version of the Uniform Commercial Code, 12A Okla.Stat. (1981) §§ 1–101 et seq., as amended through 1979, ("the Code") are pertinent. The Code provides that:

\* \* \* \* \* \*

". . . this Article applies so far as concerns any personal property and fixtures within the jurisdiction of this State

(a) to any transaction (regardless of its form) which is intended to create a security interest in personal property ..." Code § 9–102.

\*　　\*　　\*　　\*　　\*　　\*

6) The UCC drafters' comment (1) inquires by way of "test":

\*　　\*　　\*　　\*　　\*　　\*

". . . is the transaction *intended to have the effect of security*[?]" 12A Okla.Stat. (1981) § 9–102 (Emphasis added)

\*　　\*　　\*　　\*　　\*　　\*

See also *Bruce Lincoln-Mercury, Inc. v. Universal C.I.T. Credit Corp.,* 325 F.2d 2 (CA 3 1963) applying Pennsylvania law; *Morton Booth Co. v. Tiara Furniture Co.,* 564 P.2d 210, 213 (Okla.S.Ct.1977) in which it is said "[a] security interest cannot attach, come into existence, unless there is an *agreement* that it attach . . . ." (Emphasis added)

7) A "security agreement" means an agreement . . . "which *creates* or provides for a security interest." (Emphasis added) Code § 9–105(1)(h).

8) A security agreement is not enforceable against the debtor or third parties unless

"(a) the collateral is in possession of the secured party; or

(b) the debtor has signed a security agreement which contains a *description of the collateral* . . . ." (Emphasis added) Code § 9–203(1).

9) Comment 5 by the drafters of the Code states:

"The formal requisites stated in this Section are not only conditions to the enforceability of a security interest against third parties. *They are in the nature of a Statute of Frauds.*" (Emphasis added) 12A Okla.Stat. (1981) § 9–203.

10) With respect to the adequacy of description, § 9–110 of the Code provides:

". . . any description of personal property . . . is sufficient whether or not it is specific if it *reasonably identifies what is described.*" (Emphasis added)

The drafters' comment explains:

"The requirement of description of collateral . . . is evidentiary. The *test of suffi-ciency* laid down by this Section is that the description do the job assigned to it— *that it make possible the identification of the thing described.*" (Emphasis added) 12A Okla.Stat. (1981) § 9–110.

■ 11) The language of a security agreement must be such as to lead to the conclusion that the parties intended to create a security interest. *Mitchell v. Shepherd Mall State Bank,* 458 F.2d 700 (CA 10 1972) applying Oklahoma law.

12) Words used in a writing which had at the time, a well known meaning in the law, are to be employed in that sense, and it is the duty of the courts to construe the contract so as effectuate the intention of the parties. *Superior Business Assistance Corp. v. United States,* 461 F.2d 1036 (CA 10 1972); *Graham v. Chicago R.E. and P. Ry. Co.,* 431 F.Supp. 444 (W.D.Okl.1976).

13) One essential element of a contract is a meeting of the minds or consent. 15 Okla.Stat. (1981) § 2; see also *Rice v. Victor,* 222 P. 979 (Okla.S.Ct.1924).

■ 14) The Oklahoma test of "unreasonableness" of a description of collateral is stated in *First National Bank of Atoka v. Calvin Pickle Co.,* Okl., 516 P.2d 265, 67 A.L.R.3d 302 (1973), to wit:

Would it be possible for a third party to determine whether the property is subject to a security interest?

■ 15) The Bank does not have an enforceable security interest in the proceeds of the Arkansas sale.

## JUDGMENT

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that:

1. REALTY WORLD CORPORATION should be and hereby is dismissed from the captioned matter without costs.

2. R. W. Southwestern, Inc. should be and hereby is granted judgment on its counterclaim as against First National Bank & Trust Company.

3. The claim of plaintiff to a security interest in the proceeds of the sale of the

license to Realty World's Region 139, formerly held by Southwestern should be and hereby is DENIED.