**UNITED STATES of America,
Plaintiff,
v.
MID–STATES SALES COMPANY, Inc.,
Defendant.**

**Civ. Nos. 1793 L, 1794 L.**

United States District Court,
District of Nebraska.

Dec. 15, 1971.

# 1100

Thomas D. Thalken, Asst. U. S. Atty., Arnold Grundeman, Department of Agriculture, for plaintiff.

Charles J. Knight, Lincoln, Neb., for defendant.

## MEMORANDUM OF DECISION

URBOM, District Judge.

The United States of America has a general lien on all cattle owned by Larry Vencill. Mid-States Sales Company, Inc., the only remaining defendant, has a purchase money mortgage on some of the same cattle, and the issue in these cases is which of these lienholders is entitled to the proceeds of sales of certain cattle.

## FINDINGS OF FACT

Applicable to Civ. 1793 L and Civ. 1794 L

The United States of America, acting through the Farmers Home Administration, made three loans to Larry D. and Carole A. Vencill (hereinafter called the borrowers), between January 31, 1967, and May 28, 1969, in the total principal amount of $25,400.00. The loans were secured by security agreements executed by the borrowers dated March 10, 1967, January 12, 1968, and November 20, 1968. These security agreements were made applicable to these loans, either by reference to the specific loans therein or by the future advance clause. They covered the livestock which is the subject of these actions under the clause, "All livestock (except poultry kept primarily for subsistence purposes), fish, supplies and other farm products now owned or hereafter acquired by Debtor, together with all increases, replacements, substitutions, and additions thereto, . . ." These security agreements were properly perfected by the filing of a financing statement in the County Clerk's office of Lincoln County, Nebraska, on March 10, 1967. As of November 9, 1971, a balance still remained on the account of the borrowers with the plaintiff, United States of America, in the principal amount of $17,922.10, with interest accrued to that date of $1,442.27, and with interest accruing from that date at the daily rate of $2.2458.

On or about April 29, 1968, the defendant, Mid-States Sales Company, sold 24 Holstein heifers to the borrower Larry Vencill and took a purchase money security agreement on those 24 Holstein heifers, which purchase money security agreement and financing statement was properly perfected by filing in the office of the County Clerk of Lincoln County, Nebraska, on May 1, 1968. The 24 Holstein heifers referred to in the financial statement and security agreement were taken as security for a promissory note given by the borrower to Mid-States on April 29, 1968, in the amount of $9,720.00, which amount was the purchase price of the cattle described therein.

On or shortly before January 8, 1969, the borrower purchased 51 head of Holstein heifers from the defendant, Mid-States Sales Company, Inc., for the amount of $21,828.00. On January 8, 1969, the borrower executed a promissory note payable to Mid-States Sales Company, Inc. for that amount. On January 8, 1969, the borrower Larry Vencill executed a financing statement and security agreement mortgaging the 51 head of Holstein heifers to Mid-States, which financing statement and security agreement was a purchase money mortgage. This security instrument was properly perfected by filing in the office of the County Clerk of Lincoln County, Nebraska, on January 15, 1969.

The borrowers were delinquent and in default on their promissory notes and security instruments at all times subsequent to August 20, 1969, to the plaintiff United States of America and to the defendant, Mid-States Sales Company, Inc. The United States had a security interest in all of the livestock owned by Vencill. This security interest was subject only to the purchase money security interest of the defendant Mid-States on the livestock which was the subject of Mid-States' purchase money security agreement. The 21 head of cattle which are the subject of Civ. 1793 L and the 41 head of cattle which are the subject of Civ. 1794 L were all owned, subject to respective security interest of the plaintiff and defendant, by Vencill at the times of the sale or repossession referred to in the complaints.

On or about May 28, 1969, the borrowers were advised by the plaintiff that further loans would not be made to the borrowers for the purpose of feed or other operating expenses unless the borrowers showed great improvement in money management, feed production, adequate facilities, and dairy production management.

Applicable to Civ. 1793 L

The borrower, Vencill, delivered 22 head of cattle to Western Livestock Auction Company on September 4, 1969, for sale on September 5, 1969. One of the 22 cows contained a brand for which brand clearance had not been released, and that cow is not subject to this action. The remaining 21 head of cattle were sold at public auction at Western Livestock Auction Company on September 5, 1969. The total net amount gained as a result of the sale, less the amount of the sale of the branded cow, is $4,449.03. After the sale, the defendant Mid-States informed Western Livestock Auction Company of its claim to an interest in the proceeds of the sale and the amount of the proceeds has been paid into the registry of this court.

All 21 cows sold at the auction were owned by the borrower, Larry Vencill, and therefore were subject to the general lien of the United States of America, but there is no substantial evidence that any of the 21 cows was purchased by Vencill from the defendant Mid-States, except one, which bore ear tag No. 42BAX9465. As to that one, the United States has renounced in open court any claim to it. The remaining 20 cows, therefore, were not subject to the purchase money mortgage held by Mid-States.

Applicable to Civ. 1794 L

By late summer, 1969, Vencill had expended the principal amount of the loan of May 28, 1969, which had been made by the United States in the approximate amount of $2,600.00 for the purpose of buying feed for his cattle. Sometime in early August, 1969, Vencill notified Mid-States that he was out of hay to feed the cattle and asked Mid-States to take the cattle covered by its mortgages because he was unable to feed them. Perhaps ten days or two weeks thereafter Carl M. Wilson of Mid-States went to Vencill's farm and Vencill said that he would separate the 41 cattle which he had purchased from Mid-States and put them in a separate corral. Wilson then reached Dr. Robert Bohlender, a veterinarian, and asked Dr. Bohlender to prepare the cows for shipment to Colorado. On about August 22, 1969, which was approximately two weeks after Vencill had told Mid-States that Mid-States should pick up its security, Dr. Bohlender tested for brucellosis and tuberculosis the 41 cows, which Vencill had isolated into a separate corral. Of the 41, two possessed the brand of Roger Smith, who had transferred to Vencill title to those Holstein cows on or about April 10, 1969. Of the 41 cows, 25 bore ear tags which had been placed in the ears before Vencill acquired ownership. Dr. Bohlender placed ear tags on the 16 which had no ear tags when he made his tests. At the time of the testing the 41 cows were, according to Dr. Bohlender, in "good" general condition, but, according to Wilson and Vencill, were in "poor" condition because they needed

more feed. The 41 cows were "held" by Dr. Bohlender at the Vencill farm for 72 hours and on about August 26, 1969, were shipped from the Vencill farm near North Platte, Nebraska, to Ft. Collins, Colorado, where they were sold on a date, in a manner, and for an amount not reflected by the record. It has been stipulated, however, that the value of the cows was $211.00 a head.

No notice was given by Mid-States to the United States of Mid-States' intention to take or of its having taken repossession of the 41 head of cattle. The first information received by the United States regarding the repossession by Mid-States came from Vencill on August 29, 1969, three days after the cattle had been shipped by Mid-States to Colorado.

When used in this memorandum, the term "repossession" means the taking of possession on or about August 26, 1969, of cattle by Mid-States.

## DISCUSSION

The priority of a purchase money security interest over an interest acquired under an after-acquired property clause is established in Nebraska law by § 9–312(4), U.C.C., 6 Neb.Rev.Stat.1943, as amended, which states:

> "A purchase money security interest in collateral other than inventory has priority over a conflicting security interest in the same collateral if the purchase money security interest is perfected at the time the debtor receives possession of the collateral or within ten days thereafter."

■ It seems clear that cattle purchased as a part of a dairy herd, which is the case here, are not "inventory," as defined by § 9–109 of the statute. The parties have agreed that the purchase money security interest was perfected within ten days after the debtor received possession of the collateral and there seems to be no dispute about the fact that the United States had a lien on all the property involved in this litigation. Moreover, the government in its brief agreed that the purchase money

security interest of Mid-States has priority over the general mortgage lien of the United States as to those cattle which can be identified as the cattle sold to Vencill and on which the purchase money security interest was taken. The issue, accordingly, becomes essentially one of identification of the cattle subject to the purchase money security interest.

■ Section 9–110 says that any description of personal property is sufficient, whether or not it is specific, if it reasonably identifies what is described. The first purchase money mortgage describes the property as "fifty one (51) head of Holstein heifers with increase" and the second purchase money mortgage describes the property as "twenty four (24) Holstein heifers with increase." I cannot conclude that the description is so inexact as to render the security instrument defective, but it is sufficiently uncertain, where other Holstein cattle are owned by the debtor, to cast a substantial burden upon the purchase money mortgagee to be able clearly to identify collateral in order to obtain a priority over another holder of a security interest.

■ The United States concedes that in Civ. 1794 L 17 of the 41 head of cattle sold by Mid-States were cattle purchased by Vencill from Mid-States and the United States has relinquished all claims on those cattle. (See plaintiff's exhibit 27.) The relinquishment results from a matching of the ear tag numbers. Analysis of the evidence respecting the remaining 24 head shows that there actually is no evidence that those 24 head were purchased by Vencill from Mid-states, except the testimony of Vencill to the effect that he placed neck chains about the cows' necks and that those neck chains contained numbers which identified the cattle purchased from Mid-States. That testimony is not very satisfactory. Vencill said that he kept records of these numbers, but that the records have been lost or destroyed. He says that the neck chains were about the necks at the time of the testing by Dr. Bohlender, but Dr. Bohlender testi-

fied that he did not see any such identification. The parties have stipulated that Vencill purchased at least 53 head of Holstein heifers from parties other than Mid-States. Sixteen of the cattle sold by Mid-States and shipped to Colorado had no ear tags or other identification at the time of the testing by Dr. Bohlender and the cattle purchased by Vencill from Mid-States were not regularly kept separate from cattle purchased from other parties. Two of the 41 head of cattle had brands, but the evidence does not indicate the ear tag numbers of those two. The two branded cows were sold to Vencill by Roger Smith, rather than by Mid-States, and were not subject, therefore, to the Mid-States lien. One ear tag number on plaintiff's exhibits 9 and 10 (which list the ear tag numbers of cattle tested by Dr. Bohlender and repossessed by Mid-States) is similar to one ear tag number on plaintiff's exhibit 13 (a list of cattle purchased by Vencill from Paul Rolfsmeier and therefore not subject to Mid-States' purchase money mortgage). It is No. 42AOZ7765 on plaintiff's exhibits 9 and 10 and No. 42AQZ7765 on plaintiff's exhibit 13. The number is so strikingly alike in each instance that I find that the numbers represent the same cow. All this suggests the unreliability of Vencill's identification of the 41 head of cattle.

■ The Uniform Commercial Code, § 9–504, permits a secured party to take possession of and dispose of collateral after default. Paragraph (3) of that section requires "reasonable notification" to the junior lienholder as to the time and place of any sale or intended disposition of collateral unless the collateral is "perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market." Mid-States in this case seeks to justify its having sold the 41 head of cattle without notification to the United States on the ground that the cattle were "perishable" or threatened "to decline speedily in value." I am persuaded that these cattle were not "perishable"

and did not threaten to "decline speedily in value" within the meaning of § 9–504. An underlying purpose of the notice requirement of § 9–504 is to afford the competing lienholder an opportunity to protect his interest and that opportunity should be withheld only if the giving of such opportunity would probably result in a loss of or substantial decline in value of the collateral. In this case, at least two weeks passed between the time Mid-States was requested by Vencill to take over the property and the time of the sale by Mid-States. Those two weeks would have been ample for notification to the United States and for the United States to have occasion to protect its interest in the cattle. Although there is conflicting evidence as to the condition of the cattle during those two weeks, there is no evidence that they became less valuable during the two weeks or that giving notice to the United States would hold any likelihood of causing a loss to any security holder. Consequently, I conclude that Mid-States was not justified in disposing of the collateral without notification to the United States.

If the United States had received notification of the intention to dispose of the 41 head of cattle, it would have been in a position to assist in the identification of the cattle, as well as to satisfy itself that the proposed disposition would net the largest return to the security holders. Because identification has become the crucial issue, as Mid-States must have known it would be, in view of the fact that it did nothing at the time of the making of the security agreement with Vencill to assure future ability to identify the specific cattle being mortgaged, Mid-States now must bear the consequences of that failure and the failure to notify the United States of the intended disposition of the 41 cattle after the default.

As to Civ. 1794 L, I conclude that Mid-States has not met its burden of proof of the identity of the cattle covered by its purchase money mortgages, except for the 17 cows listed on plain-

**1104**

tiff's exhibit 27, and also that disposing of the collateral without notice to the United States must result in Mid-States' losing its priority as to the cattle sold by it, except for the 17 listed on plaintiff's exhibit 27, to which the United States has disclaimed its own priority.

As to Civ. 1793 L, as already related, one cow was covered by the purchase money mortgage of Mid-States; the remaining 20 were not.