587 P.2d 773

A. L. MULLINS, Jr., Receiver for Sovereign Industries, Inc., a Colorado Corporation, Appellant,

v.

M. Seth HORNE, Appellee.

No. 1 CA–CIV 3597.

Court of Appeals of Arizona,
Division 1,
Department A.

Oct. 24, 1978.

Rehearing Denied Nov. 17, 1978.

Review Denied Dec. 5, 1978.

Hill & Savoy by George M. Hill, Phoenix, and Iverson, Yoakum, Papiano & Hatch, by

Neil Papiano and John A. Slezak, Los Angeles, Cal., for appellant Sovereign Industries, Inc.

Lewis & Roca by John P. Frank, Gerald K. Smith and Susan M. Freeman, Phoenix, for appellant receiver.

Kelly & Kelly, P. C. by Hubert E. Kelly and Michael E. Kelly, Phoenix, for appellee.

## OPINION

HAIRE, Presiding Judge.

The ultimate issue raised on this appeal is whether the trial judge erred in refusing to set aside a sale of corporate stock which had been pledged as security for the payment of a promissory note. The debtor contended that the sale was not commercially reasonable nor conducted by the seller in good faith as required by the applicable provisions of the Uniform Commercial Code as adopted in Arizona.[1]

The facts, in a light most favorable to the findings made by the trial judge, show that on January 25, 1971, Sovereign Industries, Inc. (sometimes referred to herein as appellant or debtor) was indebted to the First National Bank of Stillwater, Minnesota, in the amount of $91,643.63. This indebtedness was evidenced by a promissory note and collateral pledge agreement by which the debtor had pledged to the bank shares of stock of several other corporations, the most important being approximately 85% of the outstanding stock of Sovereign Iron and Steel (Iron & Steel), and 100% of the outstanding stock of Western American Travel Center (WATC). In 1972 the debtor made a partial payment on the indebtedness, and a renewal note (dated October 2, 1972) was executed which provided for the payment of the then outstanding balance of $80,000 in quarterly installments commencing on January 2, 1973, and continuing through October 2, 1974. No payments were ever made on this renewal note, although William D. Klapp, the president of the bank, had discussed this past-due indebtedness with Allen V. Croom, the president of the debtor corporation, on at least 27 occasions between October 2, 1972, and July 10, 1975, the date on which the sale of the pledged stock took place.

Appellee M. Seth Horne owned stock in the debtor corporation, and he had become increasingly alarmed concerning the financial condition of that corporation.[2] By 1975 the debtor corporation was without funds and insolvent, and continued to be insolvent through the trial of this case. Also during this period the two corporations whose stock had been pledged as collateral for the indebtedness were encountering severe financial difficulties—Iron & Steel was without funds and unable to meet its commitments; foreclosure proceedings had been initiated and were pending against certain real property which constituted the major asset of WATC.

On or about June 24, 1975, the president of the bank and Croom, the president of the debtor corporation, conferred by telephone. Although the debtor corporation was completely without funds, Croom told the bank president that the promissory note would be paid within 90 days. In the meantime, Horne had decided that the only way he could possibly salvage anything out of his investment in the debtor corporation would be to somehow acquire the collateral securing the promissory note, and through an infusion of cash attempt to protect the assets owned by the two corporations whose stock had been pledged as collateral.[3]

1. While the parties state that the law of the state of Minnesota governs the substantive questions raised in this appeal, they have consistently referred to pertinent Arizona Uniform Commercial Code provisions, since the Uniform Commercial Code has been adopted in both states.

2. The debtor corporation had at least 14,000 shareholders. Although Horne's stock interest was apparently substantial, he was not an offi-

cer or a member of the Board of Directors of the debtor corporation at any of the times pertinent to this litigation.

3. The principal asset of Iron & Steel consisted of mineral leases from the state of Arizona and federal mining claims. In June of 1975, Horne learned that lease payments to the state were about to become due and could not be made because of lack of funds. Also, there was no money to do the assessment work on the state

Therefore, on June 27, 1975, Horne and his attorney, without notifying the debtor corporation, commenced negotiations in Minnesota with the bank's president with the object of purchasing the debtor corporation's promissory note. Apparently no agreement was reached, and Horne returned to his home in Phoenix.

Three days later, on June 30, 1975, the bank president, without advising the debtor corporation of his negotiations with Horne, decided that because of a pending visit by a bank examiner, he ought to have a more current promissory note in his file. He therefore sent to the debtor corporation a letter dated June 30, 1975, which read as follows:

> "The note of Sovereign Industries, Inc., is now so seriously delinquent that I am forced to take some action.
>
> "I am enclosing a renewal note having added the two years' accrued interest in the amount of $11,200.00 to the principal and I am enclosing this renewal note for your signature.
>
> "I am enclosing a self-addressed envelope for your convenience in promptly returning the signed renewal to me."

The proposed renewal note which was enclosed was a demand note, backdated to October 2, 1974 (the date of maturity of the then-existing promissory note), and its principal amount included the interest which had accrued prior to October 2, 1974.

After the bank had mailed the proposed renewal note to the debtor corporation, but before the debtor corporation had taken any action towards signing it, Horne decided to proceed with the purchase of the indebtedness from the bank. Therefore, on July 3, 1975, the bank assigned the debtor's promissory note to Horne together with the collateral pledged to secure the payment thereof.

Prior to the actual acquisition of the indebtedness, Horne had decided to proceed immediately with collection efforts. To this end he caused notices of public sale of the pledged stock to be mailed on July 3, 1975, to the debtor corporation at its offices in Georgia, to all of the officers and directors of the debtor corporation at their various addresses,[4] and to the debtor's statutory agent in Phoenix, Arizona. The notice was also published in the Arizona Republic and the Phoenix Gazette newspapers on July 5 through 8, 1975, and in the Casa Grande Dispatch [5] on July 7 and 8, 1975.

The notice of public sale recited, among other things, that Horne was the assignee of the debtor's note and the holder of the collateral security pledged to secure payment of the note; that the note was in default; and that the collateral pledged by the debtor to secure payment of the note, including the stock of Iron & Steel and WATC, would be sold at public sale on July 9, 1975, at 10:00 o'clock a. m., in the northeast corner of the lobby of the Superior Court Building in Phoenix, Arizona, to pay the amount then due, past-due and owing on said indebtedness.

The debtor corporation received a copy of the notice of sale on Monday, July 7, 1975. At that time, Croom, the debtor's president who was in Seattle, Washington, was notified, and he immediately flew to Phoenix. He arranged for his attorneys in Phoenix to file suit on Tuesday, July 8, 1975, seeking to enjoin Horne from proceeding with the public sale. On the same date, Horne filed a separate action seeking, in essence, to enjoin the debtor corporation and its officers and directors from interfering with the security represented by the pledged collateral stock by in any way assigning, pledging, conveying, hypothecating, or otherwise encumbering the assets of Iron & Steel. These separate actions were consolidated, and hearing was held on July 8th on both

leases and federal claims, placing these leases and claims in serious jeopardy, in Horne's opinion.

**4.** The officers and directors resided in Alabama, Georgia, Iowa and Illinois.

**5.** The Casa Grande Dispatch is a local newspaper published in the county wherein the principal assets of Iron & Steel are located.

requests for injunctive relief. Both parties were enjoined by the trial court: the debtor corporation from interfering in the conduct of the affairs of Iron & Steel, and Horne from holding the sale until Friday, July 11th. However, the temporary restraining order against Horne was conditioned upon the posting of a $50,000 bond by the debtor corporation, and upon the failure of the debtor corporation to post the same, the temporary restraining order against Horne was dissolved on July 10th.[6] Therefore on that date the public sale was held. One Naegle paid $25 for a stock certificate in a defunct corporation. Horne was the successful (and only) bidder on the balance of the collateral, paying $90,000 for the Iron & Steel stock, $4,000 for the WATC stock, and $15 for certificates representing stock in several other corporations.[7] The total price paid by Horne was equal to the indebtedness involved and thus sufficient to constitute a discharge of the debtor's obligation on the promissory note.

After the July 10th sale, the parties amended their pleadings as follows. Horne sought to enjoin appellant from acting on behalf of Iron & Steel (whose stock Horne had purchased at the sale), and additionally sought production from appellant of the corporate records of Iron & Steel together with court approval of the sale. Appellant counterclaimed to set aside the sale. Trial was held in December 1975, and thereafter the trial judge entered findings of fact, conclusions of law and judgment dismissing appellant's action and counterclaim, approving the sale, and ordering production of the records of the companies Horne had acquired. The judgment also permanently enjoined appellant from taking any action with regard to its former subsidiaries, Iron & Steel and WATC.

■ On this appeal from that judgment, appellant's initial contention is that the sale

was not conducted in a commercially reasonable manner because appellee failed to give timely notice to the debtor of the proposed sale of the pledged collateral.

A.R.S. § 44–3150 (UCC § 9–504) sets forth the terms pursuant to which a secured party may dispose of collateral after the debtor's default, and requires that "every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable." While A.R.S. § 44–3147 C (UCC § 9–501(3)) prohibits the waiver or variance of the rights given to the debtor by § 44–3150, it further provides that "the parties may by agreement determine the standards by which the fulfillment of these rights and duties is to be measured if such standards are not manifestly unreasonable."

Appellee points out that the promissory note here involved sets forth a standard as follows:

"If any notification of intended disposition of any of the Collateral is required by law, such notification, if mailed, *shall be deemed reasonably and properly given if mailed at least five days before such disposition,* postage prepaid, addressed to the undersigned either at the address shown below, or at any other address of the undersigned appearing on the records of the Secured Party."

(Emphasis added).

After considering the evidence presented at the initial hearings in July 1975 and at the final trial on the merits held some five months later in December 1975, the trial judge found as follows on the timeliness issue:

"The notice of public sale of July 3, 1975, mailed six (6) days prior to intended disposition was not commercially unreasonable because the standard for measuring commercial reasonableness agreed to

---

6. Appellant points out the fact that no bond was required relating to the temporary restraining order issued in Horne's favor. However, the record does not reflect that appellant ever objected to the trial court's failure to require such a bond, nor even requested that such a bond be required.

7. These other corporations were entirely without assets and the acquisition of their stock by Horne is not pertinent to any issues involved in this appeal.

by the parties, a five (5) day notice of any intended disposition, was satisfied and was not manifestly unreasonable within the provisions of [A.R.S. § 44–3147 C]."

In our opinion the evidence furnishes adequate support for the findings made by the trial judge. Whether the determination to be made involves "commercial reasonableness" or "manifest unreasonableness", the rights of the creditor must be considered and balanced against the rights of the debtor. Here the creditor presented strong evidence of a possibly irreversible depreciation of the collateral had there been further delay. On the other hand, the debtor failed to present any substantial evidence that an additional day or two, or even a week, would have made any difference in the debtor's ability to pay. While the facts of this case present unusual circumstances insofar as concerns the creditor's motivation in proceeding with a sale of the collateral, from our review of the record we are satisfied that the trial judge took this motivation into consideration with all the other facts and circumstances in concluding that the sale was commercially reasonable within the meaning of that term as used in our statutes.

A.R.S. § 44–2210 (UCC § 1–203) provides that:

"Every contract or duty within this chapter imposes an obligation of good faith in its performance or enforcement."

Appellant contends that the evidence at trial shows a total lack of good faith on the part of appellee in his activities relating to the acquisition and disposition of the collateral. A.R.S. § 44–2208(19) (UCC § 1–201(19)) defines good faith as follows:

"19. 'Good faith' means honesty in fact in the conduct or transaction concerned."

Although the trial judge was not requested to and did not make a specific finding as to the "good faith" of appellee, such a finding is implicit in his finding that the sale was conducted in a commercially reasonable manner. Further, our review of the record does not disclose any evidence of acts on the part of appellee which could be classified as dishonest in fact so as to contravene the general good faith requirements of § 44–2210.

Appellant's final contention is that the trial court erred in disregarding the jury's answer to the following interrogatory:

"*INTERROGATORY NO. THREE*

Was the time allowed for the sale commercially reasonable within the applicable provisions?"

The jury answered "no".

 The simple answer to appellant's contention is that this was an action in which equitable relief was sought, and by the express provisions of Rule 39(*l*), Arizona Rules of Civil Procedure, the jury's answers in such cases are only advisory to the court.[8] Thus, in equity matters, the court may disregard the jury's verdict or answers to interrogatories. In such event, the court becomes the trier of all issues of fact and law. *See generally, Bohmfalk v. Vaughan*, 89 Ariz. 33, 357 P.2d 617 (1960). We have reviewed the evidence, and we cannot say that there was no substantial evidence to support the trial court's finding on this issue, or that the finding was clearly erroneous within the meaning of Rule 52(a), Arizona Rules of Civil Procedure.

After the parties' briefs were filed in this appeal, this Court entered an order permitting A. L. Mullins, Jr., the receiver for appellant, to file a supplemental brief in this appeal. The issues raised in the receiver's brief relate to the commercial reasonableness of the notice of sale given by appel-

---

**8.** Rule 39(*l*) reads as follows:

"39(*l*) Interrogatories when equitable relief sought; answers advisory. In actions where equitable relief is sought, if a jury is demanded, and more than one material issue of fact is joined, the court may submit written interrogatories to the jury covering all or part of the issues of fact, and such interrogatories shall be answered by the jury. The interrogatories shall be approved by the court, and each interrogatory shall be confined to a single question of fact and shall be so framed that it can be answered yes or no, and shall be so answered. The answers shall be only advisory to the court.

lee, insofar as concerns notice to the *public*, and specifically notice to certain international companies which allegedly in the past had expressed some interest in the mining properties constituting the principal asset of Iron & Steel. The problem is that the issues presented to this Court by the receiver were not issues which were raised and litigated in the trial court. We note that no contention was ever made in the trial court that the contents of the notice of sale were insufficient in any manner. Rather, the focus was entirely upon the claimed inadequacy of the time which elapsed between the giving of the notice and the time set for the sale. While the debtor did urge that the time allowed was insufficient to allow the debtor to contact and interest potential buyers in bidding on the collateral, this argument went to the question of whether the time allowed the *debtor* was reasonable, a question which we have considered and determined adversely to appellant earlier in this opinion. Additionally, we note that although the final trial on the merits was not held until some five months after the sale, appellant presented no evidence to show that any specific third party was prevented from bidding on the collateral because of lack of notice of the sale or, having received notice, lacked sufficient time within which to consider and make preparations to bid on the collateral.

In summary, insofar as concerns the issues raised by the receiver, our review of the record has not revealed any instance in which the adequacy of the notice of sale as to its conduct or efficacy as "notice to the public" was ever questioned in the trial court. An issue not raised in the trial court may not be raised for the first time on appeal. *See, e. g., Jennings v. Roberts Scott & Co., Inc.,* 113 Ariz. 57, 546 P.2d 343 (1976); *Pool v. Peil,* 22 Ariz.App. 417, 528 P.2d 168 (1974). We therefore will not consider further the issues raised in the briefs filed by the receiver.

The judgment is affirmed.

FROEB, C. J., and NELSON, J., concur.