ROCK RAPIDS STATE
BANK, Appellee,

v.

James V. GRAY and Ruth K.
Gray, Appellants.

No. 84–990.

Supreme Court of Iowa.

April 17, 1985.

James E. Haberkorn of Riter, Austin & Haberkorn, Rock Rapids, for appellee.

Considered by UHLENHOPP, P.J., and McCORMICK, SCHULTZ, CARTER, and WOLLE, JJ.

McCORMICK, Justice.

When repossessed collateral "threatens to decline speedily in value," a secured party is excused from giving the debtor notice of an intended sale. Iowa Code § 554.9504(3) (1983). After selling collateral provided by defendants James V. Gray and Ruth K. Gray without notice, plaintiff Rock Rapids State Bank brought the present action for deficiency judgment against them. In excusing the bank's failure to give notice, the trial court found the exception was applicable. We reverse because we hold that the court's finding is not supported by substantial evidence and that the ruling cannot be upheld on the ground of waiver.

In material part, section 554.9504(3), provides:

> Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable. Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor, if he has not signed after default a statement renouncing or modifying his right to notification of sale. In the case of consumer goods no other notification need be sent.

Lloyd W. Bierma of Oostra, Bierma & Schouten, Sioux Center, for appellants.

The bank contended and the trial court found that the bank was excused from

giving notice of sale because the collateral threatened "to decline speedily in value."

The collateral consisted of equipment used by the Grays in operating a restaurant in Rock Rapids. They purchased the equipment in 1978 for $20,000 and borrowed $16,500 of that amount from the bank, giving the bank a security agreement on the equipment. In 1981 they borrowed an additional $4,500 for operating expenses, covered by the same security agreement. The equipment was on rented premises that had housed a restaurant business for many years. In August 1981, the Grays defaulted on their notes. On October 20, 1981, James went to the bank and told its president he wished to close the restaurant and sell the equipment. The banker encouraged James to keep the business going.

Within the next couple of weeks, the Grays closed the restaurant. On November 4, 1981, they went to the bank, offered the keys to the bank president, and stated their intention to move to Grand Rapids, Michigan. The banker attempted to persuade them to keep the restaurant open while a buyer was sought for the equipment, but he was unsuccessful. At his request, the Grays executed a bill of sale on the equipment to the bank. They refused to stay in Rock Rapids to help prepare the equipment for sale. They gave the banker the telephone number and address of James' parents and of a friend in Grand Rapids through whom they could be reached.

Before the Grays left Rock Rapids on the following day, the banker called on them and again attempted to persuade them to stay so the restaurant could be sold as a going business. When they refused, he proposed that they assign the equity in their home as a possible way of satisfying the full debt. The Grays declined this proposal and left Rock Rapids on that date. They stayed one night with James' parents and then went on to Grand Rapids.

The banker and another bank officer inspected the restaurant premises on November 5. The banker testified as follows:

Our conclusion, after inspecting the cafe, was that the best way to sell the assets was to clean them up, make them presentable, and sell them rather quickly and sell them as a unit located inside that building. In other words, sell it to another party who wished to operate another cafe and needed generally those items of equipment.

Q. Were you concerned about how long you could keep that equipment in the cafe, the rented building, I'm making reference to. A. Yes. We didn't have title to the building, so we had the problem of having our equipment located on the property—real property of another person. We were quite interested in selling it in a timely manner, for that and other reasons.

Q. What do you think would have happened to the value of those assets if you would have had to remove them from the rented premises. A. Our opinion is that a sale of a cafe's assets on a piecemeal basis or piece-by-piece basis would seriously depreciate the value of the total. My guess would be that, individually, individual assets sold separately would bring less than half of the same assets sold as a unit in a going operation.

The bank hired two women to clean up the restaurant. They worked for two weeks in doing so.

The equipment was sold in a private sale on November 25, 1981, for $14,000. The banker testified concerning the way in which a purchaser was found:

While we were in the process of cleaning the cafe, we made it generally known in the community that the cafe assets were for sale. We sought out prospects. We talked to people that were in the cafe business in Rock Rapids. We talked to some people that we knew to be interested in the cafe business in Rock Rapids. As I remember, we listed at least six prospects and talked to at least five of them. Only one of those prospects showed a real interest, what we thought to be a viable interest. We negotiated

with them for the sale, and that resulted in the sale I just mentioned.

The banker testified that the bank did not give the Grays notice of the sale.. He said he did not believe notice was required because the Grays had given the bank the bill of sale.

When the bank brought the present action against the Grays for a deficiency judgment, the Grays raised the absence of notice as an affirmative defense. The bank countered this defense on two grounds. One was based on the statutory exception to the notice requirement for property that threatens to decline speedily in value. The other was based on a claim of waiver. The trial court found for the bank on the first ground and against it on the second. The Grays contend the court erred in finding that the statutory exception was applicable, and the bank contends that both grounds are valid. It was the bank's burden to prove compliance with the notice requirement of section 554.9504(3) or a cognizable ground for avoiding it. *See Herman Ford-Mercury, Inc. v. Betts*, 251 N.W.2d 492, 496 (Iowa 1977).

I. *The statutory exception.* The collateral sold by the bank consisted of tables, chairs, stoves, refrigerators, freezers and other equipment used in operating a restaurant. Nothing in the nature of the equipment suggests any urgency in disposing of it. It was the bank's interest in selling the equipment on the rented restaurant premises that caused the trial court to find the equipment was collateral that threatened to decline speedily in value. The court reasoned that the fact the premises were rented presented the bank with a rigid deadline over which it had no control.

The problem with this finding, however, is that the record does not show that a deadline existed. The identity of the landlord and terms of rental are not disclosed. Although the evidence established that the Grays were in default on rent, no evidence was adduced to show that the landlord had done anything to terminate the tenancy. Because a restaurant business had been located on the premises for more than forty years, the landlord may well have been as much interested as the bank in having the equipment sold in place. Moreover, the bank took two weeks to make the equipment presentable for sale, and it was not sold until twenty-one days after the Grays turned it over to the bank. This period provided ample time for notice of the intended sale to be given to the Grays.

In finding that notice was not required, the trial court relied on *American City Bank of Tullahoma v. Western Auto Supply Company*, 631 S.W.2d 410 (Tenn.Ct. App.1981). In that case a creditor repossessed Christmas toys and other seasonal items on October 26, 1978, audited them, and then "quickly sold" them to another store on November 27, 1978 "in anticipation of the Christmas season." *Id.* at 413. The trial court had made no findings on the issue of whether the creditor was excused from giving notice, and the court of appeals treated it as solely a legal issue. Based on evidence that the merchandise would decline sharply in value as Christmas approached and be virtually worthless after Christmas, the court held that notice of sale was not required because the property threatened to decline speedily in value. *Id.* at 420–21. No evidence of similar urgency was introduced in the present case. In addition, the Tennessee case has not been followed elsewhere and is atypical.

The purpose of the notice requirement is to give parties an opportunity to protect their interests at sale, and the exception applies "only if the giving of such opportunity would probably result in a loss of or substantial decline in value of the collateral." *United States v. Mid-States Sales Company*, 336 F.Supp. 1099, 1103 (D.Neb.1971). Applicability of the exception to chattels is rare: "Its obvious intent was to apply to securities in a rapidly falling market, or any other item, such as gold bullion, which is subject to price fluctuations on a daily basis." *Stensel v. Stensel*, 63 Ill.App.3d 639, 641, 380 N.E.2d 526, 528 (1978). For example, only six days' notice of intended sale of corporate stock was upheld as reasonable upon strong evidence

574

by the creditor that further delay might produce irreversible depreciation of its value. *See Mullins v. Horne,* 120 Ariz. 587, 587 P.2d 773 (Ct.App.1978).

Courts have more often refused to excuse the notice requirement. *See In re Bro Cliff, Inc.,* 8 U.C.C.Rep.Serv. (Callaghan) 1144, 1149 (W.D.Mich.1971) (air conditioners, TV sets and stereos were not apt to decline speedily in value); *United States v. Mid-States Sales Company,* 336 F.Supp. 1099, 1103 (D.Neb.1971) (herd of forty-one cattle did not threaten to decline speedily in value and two weeks was ample period for notice); *Wheeless v. Eudora Bank,* 256 Ark. 644, 647, 509 S.W.2d 532, 534 (1974) (no evidence that a used automobile threatened to decline speedily in value); *Stensel v. Stensel,* 63 Ill.App.3d at 641, 380 N.E.2d at 528 (held as a matter of law that mobile homes that had been condemned as uninhabitable did not threaten to decline speedily in value); *Maryland National Bank v. Wathen,* 288 Md. 119, 122, 414 A.2d 1261, 1263 (1980) (held as a matter of law that an automobile does not come within the notice exceptions); *State Bank of Towner v. Hansen,* 302 N.W.2d 760, 765 (N.D.1981) (as a matter of law cattle were not subject to the statutory exceptions and eighteen to twenty days was ample period for giving notice).

In the present case, we do not find substantial evidence to support the trial court's finding that the restaurant equipment was likely to decline speedily in value. There was no evidence of any desire of the landlord to have the equipment removed from the premises, and, in any event, the twenty-one day period between repossession and sale was sufficient for the giving of notice.

■ II. *The waiver ground.* We agree with the trial court that the Grays did not waive their right to notice. The court found their conduct was not sufficient to constitute waiver. The issue of their intent was one of fact. *See Federal Deposit Insurance Corp. v. Farrar,* 231 N.W.2d 602, 605 (Iowa 1975). Because the evidence was not so strong as to compel a contrary finding as a matter of law, the trial court finding is controlling.

■ Furthermore, peaceful relinquishment of collateral by the debtor with knowledge that it will be sold does not alone support a finding of waiver. *See Wheeless v. Eudora Bank,* 256 Ark. at 648, 509 S.W.2d at 534; *Nelson v. Monarch Investment Plan of Henderson, Inc.,* 452 S.W.2d 375, 377–78 (Ky.1970); *O'Neil v. Mack Trucks, Inc.,* 533 S.W.2d 832, 836 (Tex.Civ.App.1975); *Gavin v. Washington Post Employees Federal Credit Union,* 397 A.2d 968, 971–72 (D.C.1979). It has been held that a party can waive notice under section 554.9504(3) only by a written statement to that effect after default. *See Stensel v. Stensel,* 63 Ill.App.3d at 641–42, 380 N.E.2d at 528. We need not decide that issue in this case.

We conclude that the trial court did not err in rejecting the bank's waiver ground.

■ Because neither ground for failing to notify the Grays had merit, the bank was required to give them notice of the sale. The consequence of its failure to do so is loss of the right to a deficiency judgment. *Stockdale, Inc. v. Baker,* 364 N.W.2d 240, 243 (Iowa 1985). Therefore we reverse the court's judgment for the bank.

REVERSED.