**HARTFORD–CARLISLE SAVINGS BANK, Plaintiff–Respondent,**

v.

**Larry R. SHIVERS, Defendant–Movant.**

**Anita L. Shodeen, Trustee.**

**No. 96–909.**

Supreme Court of Iowa.

July 23, 1997.

John P. Roehrick of Roehrick, Hulting, Blumberg & Kirlin, P.C., Des Moines, for Defendant-Movant.

Robert M. Benton of Stuyvesant & Benton, Carlisle, for Plaintiff-Respondent.

Considered by McGIVERIN, C.J., and LAVORATO, NEUMAN, ANDREASEN, and TERNUS, JJ.

LAVORATO, Justice.

■ The case comes to us on six certified questions from the federal district court. The questions concern the viability of the absolute bar rule in Iowa. The rule bars a secured creditor from obtaining a deficiency judgment when the creditor fails to give the debtor notice of the sale of collateral required by Iowa Code section 554.9504(3) (1993). We had strictly applied the rule until *Barnhouse v. Hawkeye State Bank,* 406 N.W.2d 181 (Iowa 1987). The peculiar facts in *Barnhouse* led us not to apply the rule in that case. We conclude that the absolute bar rule is presently the law in Iowa and that *Barnhouse* is an exception to that rule.

I. *Facts and Proceedings.*

In its certification order the federal district court set out the following statement of facts. The Hartford–Carlisle Savings Bank and Larry L. Shivers entered into a security agreement granting the bank a security interest in Shivers' livestock, machinery, and equipment. On July 14, 1994, Shivers filed

for bankruptcy under Chapter 7 of the United States Bankruptcy Code.

Anita Shodeen, the trustee, abandoned Shivers' livestock on August 4, 1994. Shivers then requested the livestock be sold by private sale to a relative. The bank rejected the request and opted to sell the livestock at a sale barn. Shivers delivered the livestock to the Humeston Livestock Auction, Inc. The livestock was sold on September 8, 1994. The proceeds of the sale were paid by check to Shivers and the bank. The check was sent to the bank with Shivers' consent.

On August 31, 1994, the bank filed a motion for relief from stay so it could proceed to obtain Shivers' machinery and equipment. Duane Mott appraised the machinery and equipment on September 14, 1994; the bankruptcy court ordered the stay lifted as to the machinery and equipment; and the trustee entered a report abandoning the machinery and equipment.

The bank gave Shivers and his family the opportunity to purchase any of the machinery and equipment that Shivers chose not to exempt. Shivers declined to buy the nonexempt items, except for some fence-line feed bunks. The bank took possession of the remaining nonexempt machinery and equipment and sold it sometime between November 21, 1994, and April 28, 1995. The proceeds were first applied to satisfy the principal of a purchase money security interest owed to John Deere. The balance of the proceeds was applied to the bank's two notes that were secured by the security agreement on Shivers' livestock, machinery, and equipment.

Shivers did not file at any time after default a statement renouncing or modifying his right to notification of the sale of the livestock, machinery, or equipment. Shivers was not notified of the time and place of the sale of the livestock or the machinery and equipment. Shivers was notified that the cattle would be sold at the sale barn. He was not notified of the method or manner of disposition of the machinery or equipment.

On April 14, 1995, the bank filed a complaint objecting to the discharge of Shivers pursuant to sections 727(a)(2)(A), 727(a)(4)(A), and 727(a)(5) of the bankruptcy code and taking exception to discharge pursuant to sections 523(a)(4) and 523(a)(6) of the bankruptcy code. Shivers answered the complaint and asserted an affirmative defense alleging the bank failed to notify him of the proposed method of disposition of collateral and the time and place of the sale, as required by Iowa Code section 554.9504(3). Shivers further alleged that the bank's failure to dispose of the machinery and equipment in a "commercially reasonable manner" and to give the required notice of the disposition bars the bank from recovery of any deficiency judgment on its two notes.

In its certification order, the federal district court withdrew reference of bankruptcy jurisdiction, pursuant to 28 United States Code section 157(d) and Federal Rule of Bankruptcy Procedure 5011(a), for the sole purpose of certifying the following questions of law to our court:

(1) Is the "Absolute Bar Rule," as adopted in *Federal Deposit Insurance Corp. v. Farrar*, 231 N.W.2d 602 (Iowa 1975), still accepted in Iowa?

(2) Has the "Absolute Bar Rule" been abrogated by the decision in *Barnhouse v. Hawkeye State Bank*, 406 N.W.2d 181 (Iowa 1987) and its progeny?

(3) If the "Absolute Bar Rule" has not been abrogated, is it now applied on a case by case basis?

(4) If the "Absolute Bar Rule" has not been abrogated, must all the following factors promulgated in *Barnhouse*, (a) the loan transaction must bear a direct relation to the debt incurred; (b) the amount of collateral sold must be a bare fraction of the total collateral; and (c) the underlying purposes of [Iowa Code] section 554.9504(3) must not be frustrated, be first applied before determining if the "Absolute Bar Rule" is applicable?

(5) If the "Absolute Bar Rule" has been abrogated, does Iowa now adopt the "Rebuttable Presumption Rule"?

(6) Has a creditor's security interest been exhausted so as to ban it from seeking a deficiency judgment when a debtor retains collateral which is subject to the security interest but which has been exempted under Iowa law in a Chapter 7 bankruptcy proceeding?

## II. *Adoption and Development of the Absolute Bar Rule.*

Before proceeding to answer the certified questions, we think some background discussion would aid our analysis. Iowa Code sections 554.9503 and 554.9504(1) of Iowa's Uniform Commercial Code permit a secured creditor to repossess and dispose of collateral upon a debtor's default. Section 554.9504(1) requires the creditor to apply the proceeds of the disposition first to the expenses of the disposition and then to the satisfaction of the indebtedness secured by the collateral. The debtor is liable for any deficiency pursuant to Iowa Code section 554.9504(2).

However under Iowa Code Section 554.9504(3) "every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable." In addition, section 554.9504(3) requires that

reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor, if the debtor has not signed after default a statement renouncing or modifying the debtor's right to notification of sale.

Thus, section 554.9504(3) clearly makes commercial reasonableness and notification mandatory for the secured creditor.

What is not clear in our commercial code is what effect the secured creditor's noncompliance with these requirements has upon the creditor's claim to a deficiency judgment. Iowa Code section 554.9507(1) does provide that the debtor can sue for damages occasioned by a secured creditor's noncompliance with the commercial reasonableness and no-

tice requirements. The question is whether section 554.9507(1) is the exclusive remedy for a secured creditor's noncompliance with these requirements. Whether section 554.9507(1) is the debtor's exclusive remedy has been an issue before many courts and has not been decided uniformly. One commentator described the problem this way:

[T]he drafters failed to give adequate attention to what sanctions should apply when the secured party fails to follow the prescribed procedures. Superficially, section 9–507(1) appears to deal with the issue. The first sentence of the section provides that if the secured party is not complying with the statutory requirements, the debtor may go to court and obtain an order compelling it to do so. The second sentence allows the debtor to recover damages for any loss resulting from the secured parties' failure to follow the statute. And the third sentence provides for a monetary penalty in consumer transactions.

What the drafters seem to have failed to anticipate is that the real lever for making a secured party satisfy the Code requirements is denial of its deficiency judgment. Suits enjoining improper dispositions or seeking damages against secured parties are very rare, but secured parties seeking deficiency judgments are the norm, and denial of the deficiency is what gets secured parties' attention.

The drafters' failure to resolve the deficiency judgment question left the matter to the courts.

Robert M. Lloyd, *The Absolute Bar Rule in UCC Foreclosure Sales: A Prescription for Waste,* 40 U.C.L.A. L.Rev. 695, 722–23 (1993).

In *Beneficial Finance Co. v. Reed,* 212 N.W.2d 454, 459–60 (Iowa 1973), this court set out the two competing interpretations of the damage provision in section 554.9507(1). Under the first interpretation—the absolute bar rule—a secured creditor's failure to give proper notice or sell in a commercially reasonable manner is an absolute bar to any

*right* to recover a deficiency. *Reed,* 212 N.W.2d at 459–61. Courts espousing this theory impose an irrebuttable presumption that the value of the collateral equals the value of the debt or judgment obtained. *Id.* Thus, the courts espousing the absolute bar rule hold that the damage provision as stated in section 554.9507(1) is not the exclusive remedy for a secured creditor's noncompliance.

Under the second interpretation—the rebuttable presumption rule—a secured creditor's failure to give notice or sell in a commercially reasonable manner creates a rebuttable presumption that the value of the collateral is at least equal to the unpaid balance of the debt. Although this rule does not automatically bar the creditor from collecting any deficiency, it does shift to the secured creditor the burden of proving

> what the sale would have brought if done in compliance with [section 554.9504(3) ]. Thus, the amount between what the sale brought when performed improperly, and what it should have brought if done correctly, would be damages allowable to the debtor. If such amount did not equal the total deficiency, the creditor may recover, in the proper manner, the amount remaining unpaid.

*Id.* at 460. Under this rule, the damage provision in section 554.9507(1) is the exclusive remedy for a secured creditor's noncompliance.

In *Reed,* this court did not decide which interpretation it would follow because the creditor did not establish the amount that would have been realized had the sale been conducted according to the requirements of section 554.9504(3). *Id.* at 459–61. In these circumstances, the creditor would have failed to recover under either interpretation.

Earlier, this court inferentially adopted the absolute bar rule. *See Twin Bridges Truck City, Inc. v. Halling,* 205 N.W.2d 736, 738–39 (Iowa 1973). Specifically, *Halling* held that a creditor was required to plead and prove

notice of sale as required by Iowa Code chapter 554 as a condition precedent to the maintenance of a suit for a deficiency judgment after repossession and sale of goods. *Id.* Like *Reed,* however, the circumstances were such that the creditor would not have recovered under either the absolute bar rule or the rebuttable presumption rule. The reason, again, was that the creditor did not establish the amount that would have been realized had the sale been conducted according to the requirements of chapter 554. *Id.*

Following *Reed* and *Halling,* the court left no doubt that it was adopting the position that lack of notice defeated a claim to a deficiency judgment. *See Federal Deposit Ins. Corp. v. Farrar,* 231 N.W.2d 602, 605 (Iowa 1975). Again, the creditor failed to establish the amount that would have been realized had the sale been conducted according to the requirements of chapter 554. So the creditor would not have recovered under either rule. Nevertheless the court adopted the absolute bar rule and gave the following rationale for doing so:

> The purpose of notice under section 554.9504(3) is to permit the debtor to bid at the sale or to protect himself from an inadequate sale price. A debtor unable or unwilling to exercise his section 554.9506 redemption right may still wish to bid on the property or encourage others to do so to insure a fair sale price which would minimize or eliminate a deficiency. A debtor who forfeits his right to redeem and willingly agrees to pay any deficiency remaining after sale has good reason to appear at the sale of his property. This is clearly demonstrated by the fact [the debtor's] Chevrolet appraised as worth $130 was sold for $25.

*Id.*

In the next case we decided the creditor had established what the sale would have brought had it been conducted according to the requirements of section 554.9504(3). *See Herman Ford–Mercury, Inc. v. Betts,* 251 N.W.2d 492 (Iowa 1977). Any question that prior decisions were only dicta was now an-

swered. In *Betts*, under the absolute bar rule, the creditor would not be entitled to any deficiency. Under the rebuttable presumption rule, the creditor would be entitled to a $1000 deficiency. The $1000 represented the difference between the unpaid debt and what the vehicle should have sold for. Citing the above-quoted rationale from *Farrar*, the *Betts* court opted for the absolute bar rule and denied the creditor any deficiency. The court held

> compliance with section 554.9504(3) for notification as to the disposition of collateral security is a condition precedent to a secured creditor's right to recovery of any deficiency between the sale price of collateral and the amount of the unpaid balance. The burden is on the secured party to plead and prove compliance with the statutory requirement of notice and of reasonableness of notice.

*Id.*

Three subsequent cases were in lock-step with *Halling, Reed, Farrar,* and *Betts. See Stockdale, Inc. v. Baker,* 364 N.W.2d 240 (Iowa 1985); *Rock Rapids State Bank v. Gray,* 366 N.W.2d 570 (Iowa 1985); *John Deery Motors, Inc. v. Steinbronn,* 383 N.W.2d 553 (Iowa 1986). All three cases reiterated the important purposes the section 554.9504(3) notice serves: to insure a fair price and opportunity to redeem. *See Stockdale,* 364 N.W.2d at 243; *Gray,* 366 N.W.2d at 573; *John Deery Motors,* 383 N.W.2d at 555–56.

That brings us to *Barnhouse v. Hawkeye State Bank,* 406 N.W.2d 181 (Iowa 1987), the case that has generated the certified questions before us now. Because questions 1, 2, and 5 are interrelated, we discuss them together in the next division.

III. *Is the "Absolute Bar Rule" Still Accepted in Iowa? Has the "Absolute Bar Rule" Been Abrogated by the Decision in Barnhouse and its Progeny? If the "Absolute Bar Rule" Has Been Abrogated, Does Iowa Now Adopt the Rebuttable Presumption Rule?*

In *Barnhouse,* the debtor had borrowed approximately $50,000 from the bank to buy the assets of a business and to further finance the same business. The loans were secured by a variety of assets, including inventory. The debtor defaulted, and the bank obtained a judgment against him and his wife. Using self-help, the bank removed inventory, which was part of the collateral, from the premises of the debtor's business. In the removal process, the bank sold two items from the inventory for a total of $60 and gave the debtor credit for this amount. *Barnhouse,* 406 N.W.2d at 182–83. As one might imagine, the bank gave the debtor no notice of the sale. *Id.* at 185.

The debtor and his wife then sued the bank for actual and punitive damages for negligence, conversion, and trespass in three separate counts, based on the manner the bank entered the premises, removed the collateral, and stored it. In a fourth count, the debtor sought a declaratory judgment that the bank had waived its right to collect its "deficiency" judgment by selling some of the collateral without notice to the debtor, in violation of section 554.9504(3). Following a jury verdict for the debtor and his wife on the negligence count only, the district court ruled in favor of the debtor on the declaratory judgment action. In doing so, the court barred the bank from enforcing its preexisting judgments except against the collateral in its possession and against the debtor's real estate, upon which the bank held a second mortgage. *Id.* at 183.

In *Barnhouse,* we began our discussion by reiterating the purposes behind the requirement of notice in section 554.9504(3): to insure the debtor a fair price and opportunity to redeem. *Id.* at 185. We then outlined the two approaches—the absolute bar rule and the rebuttable presumption rule. *Id.* at 185–86. Next, we concluded that the absolute bar rule, "while appropriate in prior cases," was "inapplicable" in this case for the following reasons:

> First, this transaction was not a sales transaction in which the goods purchased bore a direct relation to the debt incurred. Rather, [the debtor's] loan was secured by

a myriad of collateral, including inventory, equipment, and accounts receivable. This collateral, neither as a whole nor separately, necessarily bore any relationship to the debt incurred. Thus, any assumption the secured collateral necessarily reflects the amount of the debt is less compelling.

Second, the amount of the collateral sold without notice was but a bare fraction of the total collateral both as to bulk and as to value. [The debtor] argues the value of this collateral is approximately $1300. [The bank] obtained $60 for the two items when they were sold. The judgment against [the debtor] is approximately $50,000.

Finally, we conclude the underlying purposes of Iowa Code section 554.9504(3) have not been frustrated in this case. In our prior decisions, the entire collateral was disposed of before notice was given to the debtor. Even in those cases involving more than one piece of collateral (*i.e.*, equipment or inventory) a deficiency judgment was not sought until all of the collateral had been liquidated. Once this collateral was sold without notice, the debtor was entirely powerless to protect his or her interest. As a result, the purposes of Iowa Code section 554.9504(3) were irrevocably frustrated.

*Id.* at 186–87 (citations omitted).

The crux of our decision appears in the following passage, which came on the heels of the above quoted reasons:

Here, however, most of the collateral involved has not been sold. Unless he waives notice and sale, upon proper notice [the debtor] will have an opportunity to purchase the collateral or otherwise attempt to guarantee the best possible price is obtained. [The debtor] indicated in oral submission he was abandoning the property as being without value. If that is true, of course, the jury award compensated [the debtor] for the full value of the seized inventory less only the two sold items. *Because the underlying purposes of Iowa Code section 554.9504(3) were not frustrat-*

*ed by the two sales, however, we are not inclined to apply the absolute bar against the full satisfaction of [the debtor's] debt.*

*Id.* at 187 (emphasis added).

We then summed up and provided instructions for the district court on remand:

We believe the only penalty, if any, that should be suffered by the bank is with respect to collateral that in fact was sold without notice. Upon remand, to the extent the court finds that the two items of collateral were sold below their reasonable market value on the date of the sales, that amount shall be credited against [the debtor's] debt. The reasonable market value of these items of collateral will be as shown on [the debtor's] business records immediately before the sales unless the bank proves a lesser value by a preponderance of the evidence.

*Id.* In effect, we applied the old common-law-conversion remedy that subtracts from the remaining debt the difference between the reasonable market value of the wrongfully-converted collateral and the collateral's resale price. This is exactly what this court did pre-commercial code. *See, e.g., Wetmore v. Wooster,* 212 Iowa 1365, 1371, 237 N.W. 430, 433 (1931); *Howery v. Hoover,* 97 Iowa 581, 584–86, 66 N.W. 772, 773–74 (1896).

■ We do not view *Barnhouse* as abrogating the absolute bar rule. Rather we view *Barnhouse* as an exception to the rule and therefore must be limited to its facts. The sale of the two items of collateral without notice to the debtor was a de minimus violation of section 554.9504(3). For this reason we implicitly recognized in *Barnhouse* that an application of the absolute bar rule in these circumstances would be patently inequitable.

In *Barnhouse,* because most of the collateral had not been sold, the debtor was in no substantially worse position than if the two items had not been sold. Put in terms of the purposes underlying section 554.9504(3), the debtor had substantially the same opportuni-

ty to bid at the sale or protect himself from an inadequate price as he would have had without the sale of the two items. This was key to our decision not to apply the absolute bar rule. *Barnhouse*, 406 N.W.2d at 187.

Accordingly, we answer "yes" to certified question one: Is the "Absolute Bar Rule," as adopted in *Farrar*, still accepted in Iowa?

We answer "no" to certified question two: Has the "Absolute Bar Rule" been abrogated by the decision in *Barnhouse?*

Because we view *Barnhouse* as an exception to the absolute bar rule, we answer "yes" to certified question three: If the "Absolute Bar Rule" has not been abrogated, is it now applied on a case by case basis? Whenever there is an exception to a rule, we must analyze each case to see if the exception applies. In this sense, we do apply the absolute bar rule on a case-by-case basis.

Our answers to certified questions one and two render moot question number five: If the "Absolute Bar Rule" has been abrogated, does Iowa now adopt the "Rebuttable Presumption Rule"?

We consider certified question four in the next division.

IV. *If the "Absolute Bar Rule" Has Not Been Abrogated, Must All the Following Factors Promulgated in Barnhouse, (A) the Loan Transaction Must Bear a Direct Relation to the Debt Incurred; (B) the Amount of Collateral Sold Must Be a Bare Fraction of the Total Collateral; and (C) the Underlying Purposes of Section 554.9504(3) Must Not Be Frustrated, Be First Applied Before Determining If the "Absolute Bar Rule" Is Applicable?*

▇▇▇ It is true that in *Barnhouse* we enumerated these three reasons for not applying the absolute bar rule to the facts of that case. *See Barnhouse*, 406 N.W.2d at 185. Nevertheless we think the overarching factor is (c): The underlying purposes of

section 554.9504(3) must not be frustrated. As mentioned, those purposes include insuring the debtor a fair price and an opportunity to redeem. As *Barnhouse* clearly points out, if the collateral sold is a bare fraction of the total collateral, those purposes are not frustrated. So, in actuality, factor (b) is subsumed in factor (c). Factors (b) and (c) are essential factors in determining whether the absolute bar rule is applicable. Factor (a) is not. Accordingly, we answer "no" to certified question four.

▇▇▇ In oral arguments, both parties agreed that certified question six does not involve any issue that needs to be addressed in this appeal. In effect, any answer on our part would be an advisory opinion. This court has repeatedly held that it neither has a duty nor the authority to render advisory opinions. *State ex rel. Turner v. Midwest Dev. Corp.*, 210 N.W.2d 525, 526 (Iowa 1973); *Eley v. Pizza Hut of Am., Inc.*, 500 N.W.2d 61, 63 (Iowa 1993) (Iowa Supreme Court has power to decline to answer certified questions from federal courts). Accordingly, we decline to answer certified question six.

These certified questions are framed in such a manner that requires us to state what the present state of the Iowa law is on the absolute bar rule. The vast majority of courts have now determined that the justifications for the absolute bar rule have worn too thin and the legal analysis giving birth to the rule was wrong in the first place. *See generally* Barkley Clark, *The Law of Secured Transactions Under the Uniform Commercial Code* ¶ 4.12[5][a], at 4–217 to 4–220 (rev. ed.1993); Steve H. Nickles, *Rethinking Some UCC Article Nine Problems—Subrogation; Equitable Liens; Actual Knowledge; Waiver of Security Interest; Secured Party Liability for Conversion Under Part 5*, 35 Ark. L.Rev. 135 (1980). Perhaps the time has come for us to revisit the issue.

V. *Disposition.*

In summary, we answer "yes" to certified questions one and three. We answer "no" to certified questions two and four. Certified

question five is moot. We decline to answer certified question six.