233 P.3d 1169

**COUNTY OF LA PAZ, Plaintiff/Counter-defendant/Appellant/Cross–Appellee,**

v.

**YAKIMA COMPOST COMPANY, INC., a Washington corporation; Yakima Company, Inc., a Washington corporation; Defendants/Counterclaimants/Appellees/Cross–Appellants,**

**Lincoln General Insurance Company, a Pennsylvania corporation, Defendant/Appellee.**

**No. 1 CA–CV 08–0759.**

Court of Appeals of Arizona, Division 1, Department C.

June 22, 2010.

---

Munger Chadwick, P.L.C. By Michael J. Meehan, Of Counsel, Tucson, Attorneys for County of La Paz.

Gallagher & Kennedy, P.A. By Mark A. Fuller, Glen Hallman, Phoenix, Attorneys for Yakima Compost Company and Yakima Company.

Lewis Brisbois Bisgaard & Smith, L.L.P. By Dominique Barrett, Karen L. Karr, Phoenix, Attorneys for Lincoln General Insurance Company.

## OPINION

TIMMER, Chief Judge.

¶ 1 This breach-of-contract action arises from performance of a contract between the County of La Paz (the "County") and Yakima Compost Company, Inc. and Yakima Company, Inc. (collectively "Yakima") in which Yakima agreed to receive and process sewer sludge on county land for twenty-five years. The County appeals from a $9.2 million judgment entered after a jury returned a verdict in the form of special interrogatories in favor of Yakima. The County also appeals the trial court's rulings that denied its post-trial motion for judgment as a matter of law, new trial, and remittitur and reaffirmed a judgment as a matter of law in favor of Lincoln General Insurance Company ("Lincoln"), which served as surety on a bond required by the parties' contract. Yakima cross-appeals that portion of the judgment that terminated the contract in light of Yakima's recovery of lost future profits. For the reasons that follow, we affirm.

## BACKGROUND[1]

¶2 On September 17, 2002, the County and Yakima executed the Regional Sludge Drying Facility Operation Agreement (the "Agreement"), which permitted Yakima to receive sewage sludge from wastewater treatment facilities located inside and outside Arizona and process it by solar drying on county land for an initial period of twenty-five years. The Agreement recited that the sludge drying facility would be located temporarily on a county landfill, the facility would be relocated within three years, and the County was "diligently pursuing acquisition of a permanent site." Among other provisions, the Agreement required Yakima to provide a closure plan to the County for approval prior to operation, furnish the County a $1 million performance bond (the "Bond") within sixty days, and comply with all local, state, and federal environmental laws.

¶3 Soon after execution of the Agreement, disputes arose between the parties, which culminated in initiation of this lawsuit by the County on May 15, 2003, a counterclaim filed by Yakima on June 9, 2004, and the County's joinder of Lincoln, surety under the Bond, as a defendant on February 3, 2005. After the parties engaged in extensive discovery, and the trial court denied the County's multiple motions for summary judgment, the case proceeded to a jury trial in August 2007. During trial, the trial court granted Lincoln's motion for judgment as a matter of law ("JMOL"), ruling the County did not present any evidence regarding Lincoln's breach of its obligations under the Bond and that Yakima's breach of the Agreement was still an issue to be determined. The trial court denied the County's motion for JMOL on Yakima's counterclaim.

¶4 The jury returned special interrogatory answers finding that (1) Yakima did not ma-terially breach the Agreement, (2) the County was not damaged by any breach by Yakima, (3) the Agreement did not permit the County to terminate after three years, (4) the County breached the Agreement, (5) Yakima was damaged by the County's breach, and (6) Yakima's damages totaled $9.2 million. On January 25, 2008, the trial court entered a judgment awarding Yakima $9.2 million in damages, but ordered that the Agreement be terminated because the jury had awarded Yakima damages for lost future profits. Additionally, the court awarded Yakima $750,000 in attorneys' fees and $10,000 in costs. The court also awarded Lincoln $45,795.44 in attorneys' fees. Thereafter, the County filed a motion seeking relief from the judgment in the alternative forms of JMOL, new trial, and/or remittitur. In a detailed ruling, the trial court denied the County's motion. This timely appeal and cross-appeal followed.

## DISCUSSION

### I. The appeal

### A. Denial of motion for JMOL or new trial on Yakima's counterclaim on Yakima's counterclaim

¶5 The County argues the trial court committed reversible error by denying its motion for JMOL or new trial urged on several bases, which we address in turn.[2] We review the court's JMOL ruling de novo and view the evidence and all reasonable inferences from the evidence in the light most favorable to Yakima as the nonmoving party. *Hudgins v. Sw. Airlines, Co.*, 221 Ariz. 472, 486, ¶37, 212 P.3d 810, 824 (App. 2009). We review the court's refusal to grant a new trial for an abuse of discretion. *Id.*

---

1. We view the facts in the light most favorable to sustaining the jury verdict. *Walter v. Simmons*, 169 Ariz. 229, 231, 818 P.2d 214, 216 (App. 1991).

2. The County also challenges the court's denial of its motions for summary judgment to the extent the motions relied on the same arguments later urged in the motion for JMOL. As the County acknowledges, the denial of a motion for summary judgment usually is not reviewable on appeal, but we may review it if the court's ruling was based on a point of law. *Hourani v. Benson Hosp.*, 211 Ariz. 427, 430, ¶4, 122 P.3d 6, 9 (App.2005). We decline to do so here as the court denied the motions (1) because factual issues existed, which were later tried to a jury, or (2) for the same legal conclusions underlying its ruling on the motion for JMOL, which we review on appeal.

## 1. Notice of claim

¶ 6 The County argues it was entitled to JMOL because Yakima failed to comply with Arizona Revised Statutes ("A.R.S.") section 12–821.01(A) (2003), which bars a lawsuit against a public entity unless the claimant notifies the entity of its claim within 180 days of the claim's accrual date.[3] Alternatively, the County contends the court erred by refusing to submit the issue to the jury, thereby requiring a new trial. Yakima counters, among other things, the trial court correctly denied JMOL and a new trial because the County waived the statutory compliance issue as a matter of law by failing to assert it until raising it in a motion for partial summary judgment filed on November 17, 2006, approximately thirty months after initiation of the counterclaim.

¶ 7 The County waived the statutory-compliance issue by failing to assert it in either a reply to the counterclaim or a motion filed pursuant to Arizona Rule of Civil Procedure ("Rule") 12(b). As our supreme court noted last year, lack of compliance with § 12–821.01(A) is an affirmative defense that a governmental entity waives by failing to assert it in an answer or a Rule 12(b) motion. *City of Phoenix v. Fields,* 219 Ariz. 568, 574, ¶ 27, 201 P.3d 529, 535 (2009); *see also Pritchard v. State,* 163 Ariz. 427, 432, 788 P.2d 1178, 1183 (1990). In the present case, the County elected not to challenge Yakima's counterclaim via a Rule 12(b) motion. And although the County raised a number of affirmative defenses in its reply to the counterclaim, it failed to raise lack of compliance with A.R.S. § 12–821.01(A). For this reason alone, the trial court correctly ruled that the County had waived the issue.

¶ 8 The County does not contest it failed to preserve the statutory compliance defense in its reply or a Rule 12(b) motion but instead argues it nevertheless preserved the defense by raising it in a disclosure statement provided to Yakima on October 27, 2004, four months after Yakima filed its counterclaim.[4] Even assuming the County could preserve its defense by raising it in a disclosure statement, the court was not precluded from finding waiver because the County actively litigated the counterclaim for an extended period before asserting its defense in the motion for summary judgment. We are guided by the supreme court's decision in *Fields,* which held that even when a party properly preserves its notice of claim statutory defense in an answer or Rule 12(b) motion, "it may waive that defense by its subsequent conduct in the litigation." 219 Ariz. at 574, ¶ 29, 201 P.3d at 535. The court reasoned that any challenge to the sufficiency of a notice is facially apparent and can be quickly and easily adjudicated early in the case, thereby avoiding protracted litigation. *Id.* at 575, ¶ 30, 201 P.3d at 536. Consequently, the court held that a government entity waives the defense by taking substantial action to litigate the merits of a claim that would have been unnecessary had the entity promptly asserted the defense. *Id.* Because the city in *Fields* had engaged in discovery and motion practice unrelated to the sufficiency of the notices of claim for four years before raising the defense in a motion for summary judgment, the court held that the city had waived the defense as a matter of law. *Id.* at ¶¶ 31–33; *see also Jones v. Cochise County,* 218 Ariz. 372, 380–81, ¶¶ 27–29, 187 P.3d 97, 105–06 (App.2008) (holding defendant had waived notice of claim defense by actively litigating case for nearly one year after complaint filed).

¶ 9 Like the defendants in *Jones* and *Fields,* the County actively defended the counterclaim by engaging in extensive pretrial discovery and by filing motions unrelated to the notice of claim statutory defense. Nevertheless, the County attempts to distinguish these cases by asserting that unlike the situations in *Fields* and *Jones,* discovery was necessary to precisely identify the ac-

---

3. The notice must include: (1) facts sufficient to permit the public entity to understand the basis upon which liability is claimed, (2) a specific amount for which the claim can be settled, and (3) the facts supporting the amount claimed. A.R.S. § 12–821.01(A).

4. The disclosure statement challenged the timing of the notice of claim but not its content. Thus, the disclosure statement unquestionably failed to preserve the County's challenge to the content of Yakima's notice of claim.

crual date of Yakima's counterclaim before the County could raise the statutory defense in its motion for partial summary judgment filed November 17, 2006. The record does not support this argument. The County identified accrual dates in its disclosure statement submitted four months after Yakima filed its counterclaim. No reason appears why the County could not have then moved the court to dismiss the counterclaim for lack of compliance with A.R.S. § 12–821.01(A). Moreover, the County substantially litigated issues related to the counterclaim that were unrelated to the accrual issue. For example, the County moved to strike Yakima's damages expert witness on November 18, 2005 and, as reflected in its March 22, 2006 Rule 16(b) scheduling conference memorandum, retained its own expert witness on Yakima's damages and disclosed that expert's report. The County also deposed Yakima's damages expert on September 20, 2006. Therefore, even assuming additional discovery was warranted before moving for partial summary judgment on the notice of claim statutory defense, the County waived that defense by litigating the merits of the counterclaim for an extended period before filing its potentially dispositive motion.

¶ 10 The County also argues it could not have predicted the holdings in *Jones* and *Fields,* and therefore the trial court erred by ruling that the County's delay in asserting its defense served as an intentional waiver of the defense. *See Am. Cont'l Life Ins. Co. v. Ranier Constr. Co.,* 125 Ariz. 53, 55, 607 P.2d 372, 374 (1980) (holding waiver is "express, voluntary, intentional relinquishment of a known right or such conduct as warrants an inference of such an intentional relinquishment.").

■ ¶ 11 We reject the County's contention for two reasons. First, *Jones* and *Fields* did not establish a new legal principle by holding that the notice of claim statutory defense is an affirmative one subject to waiver. *See Pritchard,* 163 Ariz. at 432, 788 P.2d at 1183 (holding challenge to timeliness of a notice of claim is an affirmative defense and "is subject to waiver"); *Young v. City of Scottsdale,* 193 Ariz. 110, 114, ¶ 15, 970 P.2d

942, 946 (App.1998) (deciding city waived defense that notice of claim was improperly served by processing claim and failing to object to service of process), *disapproved on other grounds by Deer Valley Unified Sch. Dist. No. 97 v. Houser,* 214 Ariz. 293, 297, ¶ 12, 152 P.3d 490, 494 (2007). Thus, the County could have anticipated it would lose its ability to raise the statutory defense by actively litigating the counterclaim for a lengthy period of time. Indeed, the supreme court in *Fields* found waiver as a matter of law even though the city decided to substantially litigate the case prior to raising the statutory defense before the decision in *Jones.* Second, the County did not have to consciously intend to relinquish its defense in order to waive it, as the County implicitly asserts. Waiver may be inferred from a party's actions that are inconsistent with intent to assert a right. *Jones,* 218 Ariz. at 379, ¶ 23, 187 P.3d at 104.

■ ¶ 12 Finally, we reject the County's contention that the trial court violated its due process rights by applying *Jones* "at the last moment" without notice to either party and when the County had insufficient time to contest the ruling before having to file its notice of appeal. Even assuming the County was deprived of its due process right to notice and an adequate opportunity to present its claims, *see Kessen v. Stewart,* 195 Ariz. 488, 492, ¶ 16, 990 P.2d 689, 693 (App. 1999), because it fails to demonstrate how it was unreasonably prejudiced by the deprivation, we do not find reversible error. *Borchers v. Ariz. Bd. of Pardons & Paroles,* 174 Ariz. 463, 467, 851 P.2d 88, 92 (App.1992). Specifically, because we review the trial court's application of *Jones* de novo, the County has received a full and fair opportunity to be heard on the issue. *See Mobilisa, Inc. v. Doe,* 217 Ariz. 103, 113, ¶ 32, 170 P.3d 712, 722 (App.2007) (deciding no prejudice from trial court's ruling on discovery request before receipt of response because, among other reasons, appellate court considered response as part of de novo review).

¶ 13 In summary, the trial court correctly decided as a matter of law that the County waived the notice of claim statutory defense by failing to assert it in either a reply to the

counterclaim or a Rule 12(b) motion and by litigating the merits of the counterclaim for an extended period of time. Consequently, the court did not err by denying the motion for JMOL on this basis and by refusing to grant a new trial to submit the applicability of the statutory defense to the jury.

## 2. Right of termination without cause

¶ 14 The County argues it was entitled to JMOL on Yakima's counterclaim because the County had an absolute right under sections 6 and 18(B) of the Agreement to terminate the Agreement regardless of whether it made any effort to secure a permanent site for the sludge drying facility within a three-year period, thereby obviating the counterclaim. Yakima responds, and the trial court agreed, the jury properly interpreted sections 6 and 18(B) as permitting termination of the Agreement only if the County was unsuccessful in securing a permanent site after making a diligent effort to do so. We review the trial court's interpretation of the Agreement de novo as a matter of law. *Burke v. Voicestream Wireless Corp. II*, 207 Ariz. 393, 395, ¶ 11, 87 P.3d 81, 83 (App.2004).

¶ 15 After reciting that the location of the sludge drying facility will be relocated after three years, section 6 of the Agreement provides, in relevant part, as follows:

> The County is diligently pursuing acquisition of a permanent site for the Sludge Drying Facility. Upon finalization of such acquisition[,] Yakima shall proceed to obtain all necessary permits and approvals for relocation and operation of the Sludge Drying Facility to the permanent site[,] and shall relocate the Sludge Drying Facility as expeditiously as possible once such permits and approvals are obtained. If the County does not succeed in acquiring a permanent site within three (3) years after execution of this Agreement, the County may terminate this Agreement pursuant to Section 18 below.

Section 18(B) of the Agreement permits the County to terminate the Agreement "if it has not acquired a permanent site for the Sludge Drying Facility as of the date that is three (3) years after execution of this Agreement."

The crux of the parties' dispute is whether section 6 imposed on the County an obligation to diligently seek a permanent site throughout the three-year period.

¶ 16 We construe the meaning of a contract provision from the language the parties used and in view of all circumstances. *Smith v. Melson, Inc.*, 135 Ariz. 119, 121, 659 P.2d 1264, 1266 (1983). We give words their ordinary meaning and interpret the contract "so as to make it effective and reasonable." *Phelps Dodge Corp. v. Brown*, 112 Ariz. 179, 181, 540 P.2d 651, 653 (1975). Applying these principles, we decide the trial court correctly rejected the County's argument.

¶ 17 A plain reading of section 6 reveals the County was obligated for a minimum of three years to seek a permanent site for the sludge drying facility. Section 6 provides that the County has the right to terminate the Agreement "[i]f the County does not succeed in acquiring a permanent site within three (3) years." The word "succeed" contemplates the County would expend effort to acquire a permanent site. *See* Webster's II New College Dictionary 1127 (3d ed. 2005) (defining "succeed" as, among other things, "[t]o accomplish something desired or intended"); *see also Wagenseller v. Scottsdale Memorial Hosp.*, 710 P.2d 1025, 1038, 147 Ariz. 370, 383 (1985) (holding the covenant of good faith and fair dealing implied in every contract "requires that neither party do anything that will injure the right of the other to receive the benefits of their agreement"). Section 6 defines the duration of the effort as three years. Thus, as a matter of law, the Agreement imposed an obligation on the County to actively seek a permanent site, and the trial court correctly rejected the County's contention that it could terminate the Agreement at the end of three years even if it made no effort to acquire a site.

## 3. Right of termination with cause

¶ 18 The County next argues the trial court erred by denying its motion for JMOL because Yakima breached the Agreement by failing to timely submit the Bond, closure plan, and aquifer permit, thereby permitting the County to terminate the Agreement and negating the counterclaim. Yakima re-

sponds, and the trial court agreed, that whether Yakima breached the Agreement was an issue of fact for the jury, and we should defer to the jury's finding.

*The Bond*

 ¶ 19 Section 30 of the Agreement required Yakima to furnish the Bond to the County within sixty days after the County executed the Agreement on September 17, 2002. The purpose of the Bond was to guarantee that a surety would assume responsibility for completing performance of the Agreement, including a clean closure of the facility, in the event of Yakima's default. Because Yakima failed to furnish the Bond prior to November 16, 2002, the County contends it was entitled to terminate the Agreement, which it did on February 18, 2003, and the trial court erred by refusing to grant JMOL on this basis. Yakima offers several responses, and we find one dispositive: Even assuming the failure to furnish the Bond triggered the County's contractual rights to terminate the Agreement, the County was contractually prevented from taking this action because Yakima sufficiently cured any breach.

¶ 20 Section 15 of the Agreement provides, in relevant part, that "failure or unreasonable delay by either party to perform any material obligation" constitutes a default unless the nonperforming party "commences to cure[,] correct or remedy such failure or delay[,] and ... completes such cure[,] correction or remedy in accordance with Section[ ] 18." Section 18 permits the County to terminate the Agreement under specified circumstances unless Yakima (1) commences to cure its failure within thirty days after the date the County provides written notice of default, and (2) cures the default "in a diligent manner within a reasonable period of time" after commencement of the effort to

cure. The evidence presented at trial supports a finding that Yakima satisfied these conditions.

¶ 21 Yakima presented sufficient evidence to permit the jury to find that Yakima timely commenced efforts to cure its failure to furnish the Bond. Yakima submitted a closure plan on November 6, 2002 for the County's approval, which was not forthcoming by January 10, 2003, the date the County notified Yakima of its default.[5] According to Jim Willett, Yakima's president, before issuing a performance bond, insurance companies required an approved closure plan to completely define Yakima's performance.[6] In a letter dated April 4, 2003 (trial exhibit 656), Yakima's attorney described his client's efforts to obtain the Bond before and after the County's notice of default. He referred to letters previously provided to the County showing that three leading insurance brokers had contacted "no less than fifteen major insurance companies," which had refused for underwriting reasons to provide the Bond. Additionally, Willett testified that around the time he received the County's notice of default, he explored the possibility of obtaining the Bond with a letter of credit from Yakima's bank in lieu of an approved closure plan but was unsuccessful. In light of this evidence, the jury was justified in finding that Yakima made continuing efforts to cure the breach during the thirty-day period after issuance of the notice of default.

¶ 22 The evidence further permitted the jury to find that Yakima cured the default in a diligent manner within a reasonable time frame by working with the County to obtain an acceptable closure plan and Bond form. Jay Howe, a member of the County's Board of Supervisors in 2002, testified that although Yakima submitted a closure plan on November 6, 2002, the County did not notify Yakima

---

5. Without a citation to the record, the County asserts that Yakima did not officially submit the closure plan to the County until May 8, 2003. Supervisor Jay Howe informed the court later that month, however, that the County had Yakima's closure plan by December 6, 2002. The jury was free to find that Yakima submitted the plan on November 6, 2002, as noted on the document.

6. The County contends Yakima's need for an approved closure plan was fabricated as evidenced by its failure to raise the issue until after the County terminated the Agreement. The jury was free to reject this contention and believe Yakima's position, however. *See Logerquist v. McVey,* 196 Ariz. 470, 488, ¶ 52, 1 P.3d 113, 131 (2000) (noting jury determines accuracy, weight, and credibility of testimony as an issue of fact).

of any deficiencies with the plan until March 31, 2003. After Yakima submitted a revised plan on May 8, the County did not approve the plan until October 20 and did not notify Yakima of its decision until Howe spoke with Yakima's attorney in November. As Howe stated, "[T]he reason [for the absence of the Bond] was the fault of the County's because of the tie between the clean Closure Plan and the ... Bond. You cannot bond something you don't have approved [sic]."

¶ 23 Howe further testified that thirteen days after Yakima learned of the County's approval of the closure plan, the County received a letter from Yakima's insurance agent stating that the Bond had been approved and would be issued "within a couple of days" provided the County approved the form of the Bond, which mirrored the County's format, but additionally included an annual renewal clause. Howe stated the County initially denied the form because "what they wanted was a 25–year bond," but ultimately approved that same form six months later on May 13, 2004. Willett called the bond company the day he learned of the County's approval, and Yakima submitted the Bond the following month on June 17, 2004.

¶ 24 Ron Ballard, a surety bond agent, testified that he had been in the performance bond industry since 1979 and was involved in the issuance of the Bond in this case. Ballard explained that a bonding company will not issue a performance bond without knowing what performance is being guaranteed and that a twenty-five-year or ten-year performance bond does not exist within the industry. Ballard testified that a normal term for a performance bond is "[t]ypically one year or less." In a letter addressed to Yakima's insurance agent regarding the Bond, Ballard stated that his company could only issue a bond for an annual renewable term "[d]ue to the scope of work and the total

length of [Yakima's] overall contract with the [County]." The letter further explained, "The surety industry in general does not issue bonds for terms that come anywhere close to the term of this particular contract." According to Ballard, the major concerns he had with issuance of the Bond were the incompletion of the closure plan and the lack of a one-year, renewable term limit.

¶ 25 Based on the foregoing evidence, the jury was justified in finding that Yakima acted diligently to furnish the Bond by working with the County to secure its approval of both the closure plan and the term of the Bond.[7] Because Yakima furnished the Bond approximately one month after the County approved the Bond's form, the jury could have found that Yakima furnished the Bond within a reasonable period of time. Consequently, the trial court correctly denied the County's motion for JMOL on this issue. In light of our decision, we need not address the parties' alternative arguments concerning the timing of the Bond.

*The Closure Plan*

■ · ¶ 26 Section 2(D) of the Agreement states that Yakima "shall prepare a Closure Plan for the Facilities ... [and] provide[ ] [it] to the County for its review and approval prior to the commencement of operations." The County briefly argues it was entitled to terminate the Agreement because Yakima failed to obtain an approved closure plan before beginning operations or within a reasonable time after the County declared a default. We disagree.

¶ 27 Section 18 of the Agreement sets forth the type of defaults that entitle the County to terminate the Agreement after giving Yakima notice and opportunity to cure; failure to timely submit a closure plan is not included within the list. Rather, assuming the breach is a material one, sections 16 and 17 provide that the nonbreaching party may sue for

---

7. The County points out the Agreement did not require approval of the Bond form, and therefore Yakima's delay in posting the Bond was not excused by the County's initial refusal to approve the Bond form. We disagree. Although section 30 of the Agreement stated that the Bond may have an annual term, it also provided that the Bond must be substantially in the form of Exhibit

E to the Agreement, which did not limit the surety's obligation to one year. In light of this discrepancy and the County's initial objection to the annual term, the jury was justified in finding that Yakima furnished the Bond within a reasonable time frame even though it awaited the County's approval of a bond with a renewable term.

damages or specific performance. Therefore, the County was not entitled to terminate the Agreement even assuming Yakima materially breached the Agreement by commencing operations prior to obtaining an approved closure plan.

*The Aquifer Permit*

¶ 28 Section 9 of the Agreement required Yakima to comply with applicable environmental laws and obtain and maintain any necessary governmental permits, licenses, and approvals. Specifically, although the Arizona Department of Environmental Quality ("ADEQ") had not adopted regulations governing solid waste facility plans, section 9(C) compelled Yakima to comply with future regulations. If Yakima failed to operate the facility in compliance with applicable permits or environmental laws, the County had the right to either suspend receipt of new sludge or terminate the Agreement after giving Yakima notice and an opportunity to cure. The County argues the trial court erred by failing to grant JMOL on the counterclaim because Yakima failed to timely acquire an aquifer permit as required by ADEQ, thereby entitling the County to terminate the Agreement. Yakima responds, among other arguments, that sufficient evidence supported a jury finding that Yakima complied with ADEQ regulations and timely obtained the permit.

¶ 29 The Agreement does not specify the time by which Yakima must obtain a required permit. Consequently, Yakima implicitly had a reasonable time in which to obtain the aquifer permit; what constitutes a "reasonable time" is ordinarily a question for the jury. *See Zancanaro v. Cross*, 85 Ariz. 394, 398, 339 P.2d 746, 749 (1959); *Dutch Inns of Am., Inc. v. Horizon Corp.*, 18 Ariz. App. 116, 119, 500 P.2d 901, 904 (1972). We are satisfied that sufficient evidence supported a finding that Yakima obtained the permit within a reasonable time frame.

¶ 30 In October 2001, Willett notified ADEQ of Yakima's plans to operate a sludge-drying facility and asked whether an aquifer permit was required for the site. ADEQ first informed him that a permit was required in a letter dated January 29, 2004,

which Willett received in May 2004. Thereafter, Yakima and ADEQ "exchanged quite a bit . . . of information back and forth leading up to [the permit] application" filed in September 2004. ADEQ accepted the application for review and simultaneously informed Yakima it was allowed to operate while ADEQ considered the application as long as Yakima remained responsive to ADEQ's requests. After ADEQ initially reviewed the application, it changed Yakima's application category to "complex," thereby effectively extending the review period.

¶ 31 ADEQ preliminarily granted Yakima's application in October 2005, but then denied the application in September 2006 after receiving public comments, including those from the County opposing issuance of a permit to Yakima for various reasons. In a letter addressed to Willett, ADEQ stated the reason for the denial as follows:

> La Paz County (the zoning authority in this matter) has indicated that the applicant is not in compliance with zoning requirements [for operating a composting facility]. When determining if an applicant demonstrates zoning in accordance with the state statute and rule, the Department relies on the decision of the zoning authority.

According to Willett, Yakima never composted at the facility, and the County never cited Yakima for any zoning violations. On this basis, Yakima successfully appealed ADEQ's decision, and ADEQ finally issued an aquifer permit to Yakima on June 26, 2007.

¶ 32 In light of the above record, sufficient evidence supported a finding that Yakima obtained the aquifer permit within a reasonable time frame and therefore did not breach the Agreement. As a result, the trial court correctly denied the motion for JMOL on this issue.

**4. Absolute immunity**

¶ 33 Yakima's counterclaim alleged the County breached the Agreement, including the covenant of good faith and fair dealing, by (1) refusing to approve the closure plan, (2) failing to diligently pursue a permanent site, (3) opposing issuance of the aquifer

permit by ADEQ, (4) terminating the Agreement after three years, and (5) engaging in acts to frustrate Yakima's enjoyment of the Agreement. The County argues the trial court erred by denying its motion for JMOL or a new trial because the County enjoyed absolute immunity for these acts and omissions pursuant to A.R.S. § 12–820.01 (2003).[8]

¶ 34 Section 12–820.01(A), A.R.S., shields a public entity from liability for acts or omissions that constitute the exercise of (1) "a judicial or legislative function" or (2) "an administrative function involving the determination of fundamental governmental policy." Because the public policy of Arizona is to hold public entities liable for the acts and omissions of employees in accordance with the law and immunity is the exception, we narrowly construe § 12–820.01. *Doe ex rel. Doe v. State*, 200 Ariz. 174, 176, ¶ 4, 24 P.3d 1269, 1271 (2001).

¶ 35 The County argues the acts underlying the counterclaim were either legislative or administrative functions and, therefore, the County was immune from liability. The County exercises its "legislative function" by creating, defining, or regulating rights. *See In re Marriage of Waldren*, 217 Ariz. 173, 177, ¶ 20, 171 P.3d 1214, 1218 (2007); *cf. Emmett McLoughlin Realty, Inc. v. Pima County*, 212 Ariz. 351, 355, ¶ 18, 132 P.3d 290, 294 (App.2006) ("passage of a zoning ordinance is the exercise of a legislative function"); *State v. Wagstaff*, 164 Ariz. 485, 490, 794 P.2d 118, 123 (1990) ("Defining crimes and fixing penalties are legislative ... functions."). The County's administrative functions are absolutely immune from suit if they constitute policymaking rather than implementation of a policy. *Kohl v. City of Phoenix*, 215 Ariz. 291, 295, ¶ 19, 160 P.3d 170, 174 (2007). We agree with Yakima that none of the County's acts and omissions underlying the counterclaim fell within these categories.

¶ 36 The County does not explain, nor do we understand, how its decisions to perform or not perform obligations imposed by the Agreement constituted either a legislative or protected administrative function. Although the County's decision to enter into the Agreement was arguably a legislative or administrative decision protected by absolute immunity, the County cites no authority, and we are not aware of any, that would shield the County from liability for decisions amounting to a breach of its obligations under the Agreement. *See Myers v. City of Tempe*, 212 Ariz. 128, 130–31, ¶¶ 10–13, 128 P.3d 751, 753–54 (2006) (holding city's decision to enter automatic aid agreement and its actions that automatically flowed from that agreement protected by absolute immunity but recognizing that implementing decisions under agreement would not be immune). Rather, the County's discretionary acts under the Agreement were flawed operational acts made to implement the County's policymaking decision to enter the Agreement with Yakima. Consequently, they were not absolutely immune from liability. *See Doe ex rel. Doe*, 200 Ariz. at 177, ¶ 9, 24 P.3d at 1272 (recognizing that state's requirement for teacher certification immune as policymaking decision but decision to certify a particular teacher an operational decision and therefore not immune); *Fidelity Sec. Life Ins. Co. v. State Dep't of Ins.*, 191 Ariz. 222, 225–26, ¶¶ 10–12, 954 P.2d 580, 583–84 (1998) (concluding that insurance department's decision to grant company's application for transfer of domicile not entitled to absolute immunity, even though it involved some discretion, because decision only implemented policy). Indeed, sections 16 and 21 of the Agreement acknowledged that the County could be held liable for breach of the Agreement. For these reasons, and because we narrowly construe the reach of A.R.S. § 12–820.01, we decide the trial court correctly denied the County's motion for JMOL and new trial on this issue.

---

8. Although the County did not comply with Rule 50(b) by first raising this argument in its initial motion for JMOL submitted prior to submission of the case to the jury, it did not waive the issue because it was a purely legal one. *Link v. Pima County*, 193 Ariz. 336, 341, ¶ 18, 972 P.2d 669, 674 (App.1998). Thus, Yakima was not harmed by the County's failure as it could not have cured any defect by reopening its case to submit additional evidence. *Standard Chartered PLC v. Price Waterhouse*, 190 Ariz. 6, 27–28, 945 P.2d 317, 338–39 (App.1996).

### 5. Implied covenant of good faith and fair dealing

¶ 37 The County next argues it was entitled to JMOL on the counterclaim because the County merely acted in furtherance of its own contractual interests and therefore did not breach the covenant of good faith and fair dealing. Yakima responds the County's argument is flawed because it assumes an interpretation of the Agreement the jury discarded. The trial court rejected the County's argument, ruling the issue was a factual one for the jury to decide; because evidence supported the jury's decision, the court deferred to its judgment.

¶ 38 The law implies a covenant of good faith and fair dealing in every contract. *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund,* 201 Ariz. 474, 490, ¶ 59, 38 P.3d 12, 28 (2002). Among other things, a party breaches this covenant by exercising discretion afforded under the contract for a reason beyond the risks assumed by the other party. *Id.* at 492, ¶ 66, 38 P.3d at 30 (citations omitted). Whether a party breached the covenant is a question of fact for the jury. *Id.* at 493, ¶¶ 69–70, 38 P.3d at 31.

¶ 39 Citing *Southwest Savings and Loan Association v. SunAmp Systems, Inc.,* 172 Ariz. 553, 558–59, 838 P.2d 1314, 1319–20 (App.1992), the County contends its actions could not constitute a breach of the covenant of good faith and fair dealing because the Agreement permitted the County to seek termination in certain circumstances, and the County did not act "for a reason beyond the risks" that Yakima assumed. In *Southwest Savings,* we considered whether a lender acted in bad faith when it froze and later terminated a borrower's line of credit upon realizing the primary guarantor had invalidly bound community assets. *Id.* at 554–55, 838 P.2d at 1315–16. Recognizing that our supreme court had found "in a variety of contexts that a contracting party may exercise a retained contractual power in bad faith," we characterized the issue as:

> [W]hether the jury might reasonably have found that [the lender] wrongfully exercised [its contractual] power "for a reason beyond the risks" that [the borrower] assumed in its loan agreement or for a reason inconsistent with [the borrower's] "justified expectations."

*Id.* at 559, 838 P.2d at 1320 (citation omitted). Thereafter, we noted the evidence was undisputed that the lender acted solely out of a financial interest, not "out of spite, ill will, or any other non-business purpose." *Id.* Thus, we concluded the lender did not act contrary to the borrower's justified expectations. *Id.* at 561, 838 P.2d at 1322. Finding the jury's verdict was not supported by sufficient evidence, we remanded the case for entry of JMOL in favor of the lender on the borrower's bad faith claim. *Id.* at 563, 838 P.2d at 1324.

¶ 40 Unlike the situation in *Southwest Savings,* the parties here disputed whether the County exercised its discretion for reasons beyond the risks assumed by Yakima. Although Yakima assumed the risk the County would act to further its legitimate interests under the Agreement, sufficient evidence exists to support a conclusion that the County exercised its discretion merely to force a termination of the Agreement due to a change of heart regarding the wisdom of the Agreement—a risk not assumed by Yakima. For example, the jury could have concluded that the County delayed its approval of the closure plan to prevent Yakima from timely posting the Bond, thereby placing Yakima in breach of the Agreement. First, evidence was presented at trial demonstrating the County's remorse about the Agreement and a desire to be free of it. Mark Patterson, an unsuccessful candidate for the La Paz County Board of Supervisors, testified that Supervisor Gene Fisher told him in 2004, "Mr. Willett was nothing more than a shit broker and that the County was going to do anything they could to get out of the contract." According to Patterson, Fisher "stated that Mr. Willett was not a businessman that he wanted in La Paz County." Patterson also testified that Fisher "indicated that Supervisor Edey was on [b]oard with him against [Yakima] ... [but] that he reversed his decision and voted for [the Agreement]." Supervisor Howe sent the trial court judge a letter dated May 27, 2003 stating that the situation "has been highly

politicized and objectively compromised by County Officials and staff" and that the delay in posting the Bond was attributable to the County's failure to timely approve a closure plan. Given this record, we conclude the jury could have reasonably found the County wrongfully exercised its contractual power for "a reason beyond the risks" that Yakima assumed. *Id.* at 559, 838 P.2d at 1320.

¶ 41 Second, the evidence allowed the jury to conclude the County lacked a valid reason for delaying its approval of the closure plan. Although the County contends it had the right to expend time to ensure adoption of an appropriate closure plan, we note that the differences were slight between the closure plan submitted on November 6, 2002 and the one ultimately approved on October 20, 2003, suggesting the County had no valid reason for delaying its approval of the closure plan. This conclusion was particularly warranted as Yakima had informed the County of the need for the closure plan before a company would issue the Bond, and, while the approval was pending, the County maintained that Yakima had breached the Agreement due to its failure to post the Bond. Consequently, and in light of the evidence of the County's change of heart about the Agreement, the jury could have concluded the County delayed approval of the closure plan merely to thwart Yakima's ability to post the Bond, thereby placing it in default of the Agreement. For this additional reason, the trial court correctly rejected the County's argument.

### 6. Bidding requirement

¶ 42 The County also argues it was entitled to JMOL on the counterclaim because the Agreement was a lease entered in contravention of the bidding requirements of A.R.S. § 11–256 (Supp.2009) and was therefore void. Yakima counters the Agreement was not a lease but "at most, a license" and, regardless, the County could not invoke § 11–256 to void the Agreement after representing it as a valid contract. The applicability of § 11–256 is a matter of law that we review de novo. *Schwarz v. City of Glendale,* 190 Ariz. 508, 510, 950 P.2d 167, 169 (App.1997).

¶ 43 Section 11–256, A.R.S., authorizes a county board of supervisors to "lease or sublease" land or buildings at a public auction to the highest responsible bidder. A "lease" creates an interest or estate in the land itself and gives the leaseholder a right of exclusive possession like that of an owner or exclusive use for all purposes, except those prohibited by its terms. *See Saxman v. Christmann,* 52 Ariz. 149, 153, 79 P.2d 520, 522–23 (1938), *criticized on other grounds by Rundle v. Republic Cement Corp.,* 86 Ariz. 96, 97, 341 P.2d 226, 227 (1959); *Tanner Cos. v. Ariz. State Land Dep't,* 142 Ariz. 183, 193, 688 P.2d 1075, 1085 (App.1984). In contrast, "[a] license is an authority or permission to do a particular act or series of acts upon the land of another without possessing any interest or estate in such land." *Tanner,* 142 Ariz. at 193, 688 P.2d at 1085 (citations omitted).

¶ 44 We agree with Yakima that the Agreement constituted a license rather than a lease. Under the terms of the Agreement, Yakima agreed to operate initially on land owned by the County. The Agreement did not give Yakima a right of exclusive possession of the land; BFI Waste Systems of North America, Inc. ("BFI") operated a solid waste landfill on the land pursuant to a separate agreement with the County. Indeed, BFI was involved in the determination that "it would be mutually advantageous to allow a third party to operate a sludge drying facility at the Landfill" and BFI obtained approval from ADEQ to use biosolids generated by Yakima's operation as an alternative daily cover at the landfill. Yakima only had the exclusive right to operate a sludge drying facility on the land, and to the extent of any conflict with BFI's contractual rights, BFI's rights prevailed. Additionally, the Agreement contemplated that the landfill would serve as a temporary location for Yakima's operations until a new site was located.

¶ 45 In light of these provisions, we agree with the trial court that the Agreement was a license that granted Yakima permission to conduct a particular act, rather than a lease that gave Yakima an interest in and general use of a specific parcel of land. *See Wenner v. Dayton–Hudson Corp.,* 123 Ariz. 203, 204,

207, 598 P.2d 1022, 1023, 1026 (App.1979) (holding contract granting retailer exclusive right to operate specific business, such as shoe department or beauty salon, within store is a license and not a lease). Consequently, the County was not required to submit the Agreement for bid under A.R.S. § 11–256, and the Agreement was not voided by the County's failure to do so.

## B. Denial of motion for new trial: jury instructions

¶ 46 The County argues the trial court erred by denying its motion for new trial because the court (1) erroneously instructed the jury on the definition of waiver, and (2) improperly gave the jury an impracticability instruction.[9] We review the jury instructions as a whole to determine whether the given instructions "misled the jury as to the proper rules of law." *Rodriguez v. Schlittenhart*, 161 Ariz. 609, 614, 780 P.2d 442, 447 (App.1989). We will not overturn a jury verdict on grounds of improper jury instructions "unless there is substantial doubt as to whether the jury was properly guided in its deliberations." *Sec. Title Agency, Inc. v. Pope*, 219 Ariz. 480, 491, ¶ 43, 200 P.3d 977, 988 (App.2008).

### 1. Waiver instruction

¶ 47 In accordance with the Revised Arizona Jury Instructions ("RAJI"), the trial court instructed the jury on waiver as follows:

Waiver is either the express, voluntary, [ ] intentional relinquishment of a known right, *or it is such conduct that is inconsistent with an intent to assert the right.*

By accepting performance known to be deficient, a party has waived the right to reject the contract on the basis of that performance.

(Emphasis added.) The County argues the trial court erred by giving this instruction because the above-highlighted language incorrectly suggested that contract rights could be "accidentally waived." Yakima responds

that the given instruction did not suggest any "accidental waiver." Alternatively, Yakima contends the County was not prejudiced by any error because Yakima never argued accidental waiver to the jury.

¶ 48 As the County notes, the RAJI is not binding authority. *State v. Logan*, 200 Ariz. 564, 566, ¶ 12, 30 P.3d 631, 633 (2001). Nevertheless, the trial court did not err by giving the instruction. Our supreme court has defined "waiver" as

"either the express, voluntary, intentional relinquishment of a known right or such conduct as warrants an inference of such an intentional relinquishment. Waiver by conduct must be established by evidence of acts inconsistent with an intent to assert the right."

*Am. Cont'l Life Ins. Co. v. Ranier Constr. Co.*, 125 Ariz. 53, 55, 607 P.2d 372, 374 (1980) (citation omitted). Although the challenged instruction omitted reference to an inference of an intentional relinquishment of a right, it adhered to the supreme court's definition by setting forth the type of conduct that warrants the inference—conduct inconsistent with an intent to assert a contractual right. Moreover, we fail to discern how the instruction permitted the jury to find accidental waiver. Accidental conduct, by its very nature, does not involve an intent to cause a particular result and therefore cannot be "inconsistent with an intent to assert [a] right." Thus, the instruction permitted the jury to conclude that the County intended to preserve its contractual rights despite its conduct. The trial court did not err by giving the waiver instruction.

### 2. Impracticability instruction

¶ 49 The County next argues the trial court erred by instructing the jury on impracticability because the evidence did not support the instruction. We reject this argument because the County failed to raise it to the trial court and has therefore waived it. *Regal Homes, Inc. v. CNA Ins.*, 217 Ariz. 159, 171, ¶ 52, 171 P.3d 610, 622 (App.2007)

---

9. The County also challenges the court's refusal to instruct the jury on accrual of a claim for purposes of deciding Yakima's compliance with A.R.S. § 12–821.01(A). As previously explained, *see supra* ¶¶ 6–13, the County waived its argument concerning § 12–821.01(A). For that reason, the trial court did not err by refusing to instruct the jury on the issue.

(holding appellate court generally does not consider issues raised for first time on appeal).

¶ 50 During the settling of instructions, the County objected to Yakima's requested impracticability instruction because it was "one-sided" and therefore a comment on the evidence. According to the County, it was prevented from taking certain actions until Yakima complied with its contractual obligations, "so either [the instruction] needs to be bilateral or it shouldn't be there." The court agreed with the County and made the instruction bilateral, telling the jury that each party claimed it became impracticable to perform certain provisions of the Agreement. Even assuming the County did not invite the claimed error, it waived the present challenge to it by failing to raise that objection to the trial court. Consequently, we need not address the parties' remaining arguments on this issue.

### C. Lost future profits

¶ 51 The County also argues the trial court erred by failing to enter JMOL on Yakima's lost future profits request, order a new trial, or remit the verdict because insufficient evidence supported the amount. Additionally, the County contends it could not be responsible for lost future profits stemming from the loss of business from Orange County Sanitation District ("Orange County") because the County did not cause Orange County to cease shipments to Yakima. Because the County failed to comply with Rule 50(b) by raising these evidence-based arguments in a motion for JMOL at the close of evidence, it waived any entitlement to JMOL on that basis. *Standard Chartered PLC,* 190 Ariz. at 27, 945 P.2d at 328; *Dawson v. Withycombe,* 216 Ariz. 84, 99 n. 10, ¶ 38, 163 P.3d 1034, 1049 n. 10 (App. 2007) (concluding appellants' failure to file motion for JMOL challenging the sufficiency of the evidence to support a recovery theory precluded appellants from raising that issue in a post-verdict motion for JMOL). We

therefore address the County's arguments only in the context of the motion for new trial and request for remittitur.[10]

¶ 52 The County is entitled to a new trial if the weight of evidence was against the jury's damages verdict. *Dawson,* 216 Ariz. at 99 n. 10, ¶ 38, 163 P.3d at 1049 n. 10. But "if any substantial evidence could lead reasonable persons to find the ultimate facts sufficient to support the verdict, we will affirm the judgment." *Gonzales v. City of Phoenix,* 203 Ariz. 152, 153, ¶ 2, 52 P.3d 184, 185 (2002). Remittitur is proper only "for the most cogent reasons," *Young Candy & Tobacco Co. v. Montoya,* 91 Ariz. 363, 370, 372 P.2d 703, 707 (1962), including a lack of evidence supporting the damages award. *Cont'l Townhouses E. Unit One Ass'n v. Brockbank,* 152 Ariz. 537, 543, 733 P.2d 1120, 1126 (App.1986); *see also Acuna v. Kroack,* 212 Ariz. 104, 114, ¶ 36, 128 P.3d 221, 231 (App.2006) (citation omitted) ("We will not disturb a jury's damage award unless it is 'so unreasonable and outrageous as to shock the conscience of this court.' "). We review the court's refusal to remit the verdict for an abuse of discretion. *Mammo v. State,* 138 Ariz. 528, 533–34, 675 P.2d 1347, 1352–53 (App.1983).

¶ 53 Once Yakima proved the fact of damages, it was required to demonstrate the amount of damages with "reasonable certainty." *Gilmore v. Cohen,* 95 Ariz. 34, 36, 386 P.2d 81, 82 (1963). To do so, Yakima was required to provide a basis for estimating loss that did not rest upon "conjecture or speculation." *Id.* Because lost future profits are capable of proof approaching mathematical precision, the requirement of "reasonable certainty" must be applied with added force to such damages. *Id.* at 36, 386 P.2d at 82–83.

¶ 54 Yakima's expert witness, John Gorman, Jr., testified "to a reasonable degree of financial certainty," that Yakima's total damages were $12,455,000. He opined

---

**10.** We reject Yakima's argument that the County's failure to file a motion for JMOL concerning this issue before submission of the case also precluded the County's motion for new trial. *See Dawson,* 216 Ariz. at 99 n. 10, ¶ 38, 163 P.3d at

1049 n. 10 (explaining that motion for new trial based on verdict against weight of evidence permits party to challenge verdict even if it failed to preserve the issue in an initial motion for JMOL).

that Yakima lost future profits due to losses of business from Orange County ($5,659,000) and Los Angeles County Sanitation District ("Los Angeles") ($6,677,000). Additionally, he attributed the remaining $119,000 to incremental damages. The County does not challenge Gorman's calculation methodology but instead argues that the factual assumptions underlying his calculations "w[ere] speculative in the extreme." The County points out several examples of such speculation, which we address in summary fashion and reject because each assumption had a basis in the record:

- **Orange County would provide 6,000 tons of biosolids per month.** Although Orange County was not contractually bound to send a minimum amount of biosolids, Orange County had orally committed to supply this amount and did so while it shipped biosolids to Yakima in Arizona.

- **Orange County and Los Angeles would pay $45.50 per ton although a lower figure was set forth in their contracts.** Both contracts allowed for increases in disposal costs. Synagro, Yakima's successor, negotiated a $45.50 per ton contract with Orange County, which was later amended to $60.11 per ton. Orange County paid Entertech, another disposal company, $72.40 per ton. Gorman reasoned that because the contract with Orange County was a long-term one, it was reasonable to use the $45.50 figure as a constant. Although all attributes of the Synagro and Entertech contracts were not considered, Gorman's assumption that Yakima would garner a similar price for doing the same type of work was nevertheless grounded in fact.

- **Yakima's operating expenses would remain constant.** Gorman identified Yakima's operating expenses for 2004 and then used them as a constant. He reasoned that although there would be cost increases, there would also be rate increases. Because he kept a constant rate ($45.50 per ton) he kept a constant cost, thus creating a balanced analysis.

- **Removal of $220,000 representing Willett's annual wage and adjusted $80,000 manager's salary.** Gorman identified Willett's salary approximating $300,000 as mostly profit taken by an owner rather than as a wage for managing operations. Consequently, he set $80,000 as a reasonable wage for a manager based on the salaries of others working for Yakima. Although he had no expertise in salaries specific to sludge-drying facilities, he testified that he had "experience in making reasonable compensation assessments for almost any valuation."

- **Los Angeles would exercise its yearly renewal option.** The contract with Los Angeles permitted it to renew the contract annually for ten years. Gorman did not opine on whether Los Angeles would renew the contract but merely calculated damages under the assumption it would do so; if the jury rejected this notion, it could adjust the number.

In sum, each of Gorman's challenged assumptions had a basis in fact. Assessing their accuracy and reliability was a question of fact for the jury. *Logerquist*, 196 Ariz. at 488, ¶ 52, 1 P.3d at 131. Indeed, the jury may have rejected some of the assumptions as it failed to award the full amount of Gorman's calculated damages. The trial court did not err by refusing to order a new trial or remit the verdict on this basis.

¶ 55 The County next argues that no evidence supported a finding that it caused Orange County to cease sending biosolids to Yakima, and the court therefore erred by failing to grant a new trial on damages or remit the verdict to deduct damages attributable to the loss of Orange County's business.

¶ 56 According to Orange County employee Layne Baroldi, Orange County suspended shipments to Yakima in January 2003 after learning it had failed to timely obtain the Bond in accordance with the Agreement. Baroldi, who then served as Orange County's Legal and Regulatory Affairs Liaison, recommended suspending shipments until Yakima obtained the Bond to avoid potential liability if Yakima went out of business and left the site uncleaned. Soon after suspending shipments, Orange County also cited the need for the closure plan and a revised operating

statement in order to resume shipments. According to Baroldi, Supervisor Fisher informed him of Yakima's lack of compliance with the Agreement. Orange County never resumed shipments to Yakima, electing instead to ship biosolids to Yakima's competitors.

¶ 57 The above-recited evidence, together with evidence of the County's actions and inaction related to the Bond, closure plan, aquifer permit, and efforts to terminate the Agreement, *see supra* ¶¶ 19–32, 40–41, permitted the jury to find that the County caused Orange County to initially suspend shipments of biosolids to Yakima and later to decide against resuming shipments. Consequently, the trial court did not err by denying the motion for new trial and request for remittitur on this basis.

### D. Lincoln's motion for JMOL

¶ 58 The County finally argues the trial court erred by granting JMOL to Lincoln because sufficient evidence existed to find Lincoln liable as a surety. "[G]enerally[,] a suit under a surety bond does not arise until the principal breaches the underlying contract." *R.E. Monks Constr. Co. v. Aetna Cas. & Sur. Co.*, 189 Ariz. 575, 578, 944 P.2d 517, 520 (App.1997) (citations omitted); *Cates Constr., Inc. v. Talbot Partners*, 21 Cal.4th 28, 38, 86 Cal.Rptr.2d 855, 980 P.2d 407, 412 (1999) ("In the absence of default, the surety has no obligation."). In light of our decision that sufficient evidence supported the jury's finding that Yakima did not breach the Agreement, even if the trial court erroneously granted JMOL in favor in Lincoln, such error was harmless because the County did not suffer prejudice. *Creach v. Angulo*, 189 Ariz. 212, 214, 941 P.2d 224, 226 (1997) (citations omitted) (holding error must be prejudicial to substantial rights of party to justify reversal). We therefore affirm the court's ruling. In light of our holding, we do not address the parties' remaining arguments on this issue.

11. Yakima contends the County waived its election-of-remedies argument by failing to allege it as an affirmative defense. Because Yakima asserted this contention for the first time in its

### II. The Cross–Appeal

¶ 59 Yakima argues the trial court erred by entering judgment in the form submitted by the County, which stated the Agreement had terminated. Because the jury found that the County had no right to terminate the Agreement after three years, Yakima contends it was entitled to both damages and specific performance. The County responds that by seeking and obtaining future lost profit damages, Yakima elected compensatory damages as its remedy rather than specific performance.[11] We review the court's refusal to order specific performance for an abuse of discretion. *Queiroz v. Harvey*, 220 Ariz. 273, 274, ¶ 7, 205 P.3d 1120, 1121 (2009).

¶ 60 Jury Interrogatory Number 5 asked, "Does the preponderance of the evidence show that the County was allowed to terminate the Contract, at the end of the three year period, pursuant to Paragraphs 6 and 18(B) of the Contract?" The jury answered, "No." Yakima claims the jury's answer constituted a finding that the Agreement remained in effect after trial, and the trial court erred by failing to enforce that finding by ordering the County to perform the remaining term of the Agreement. We disagree.

¶ 61 Whether Yakima was entitled to specific performance was a decision for the trial court sitting as a court of equity rather than the jury, which acted in an advisory role concerning the propriety of any equitable remedy. *Shreeve v. Greer*, 65 Ariz. 35, 39, 173 P.2d 641, 644 (1946); *Mullins v. Horne*, 120 Ariz. 587, 591, 587 P.2d 773, 777 (App. 1978). Consequently, even assuming the jury's interrogatory answer reflected a view that the Agreement remained viable despite the damages award, the court was not bound by the finding. *Mullins*, 120 Ariz. at 591, 587 P.2d at 777 ("[I]n equity matters, the court may disregard the jury's verdict or answers to interrogatories. In such event, the court becomes the trier of all issues of fact and law."). Accordingly, we will uphold

reply brief, it has waived the issue. *Romero v. Sw. Ambulance*, 211 Ariz. 200, 204 n. 3, ¶ 7, 119 P.3d 467, 471 n. 3 (App.2005).

the court's ruling if the evidence supported its exercise of discretion.

¶ 62 Yakima contends, essentially, the trial court erred by failing to order specific performance because continuation of the Agreement was consistent with the jury's damages award and consequently an equitable result. Generally, three remedies are available for a breach of contract: rescission, continued performance, or termination and damages. *W. Pinal Family Health Ctr., Inc. v. McBryde*, 162 Ariz. 546, 548, 785 P.2d 66, 68 (App.1989). The court will not order specific performance if damages would adequately protect the nonbreaching party's expectation interest. *Restatement (Second) of Contracts* § 359(1) (1981). Yakima is correct, however, that compensatory damages and specific performance can be awarded simultaneously in limited circumstances. The court may award equitable damages when specific performance does not afford complete relief. *Woliansky v. Miller*, 146 Ariz. 170, 172, 704 P.2d 811, 813 (App.1985) (holding that "a party who elects specific performance may also be awarded equitable damages when the decree does not afford complete relief"). The nonbreaching party may also receive damages for the breaching party's failure to perform one part of the contract and also attain specific performance of the contract as a whole. *Restatement (Second) of Contracts* § 359(2). Neither situation occurred in the present case, however.

¶ 63 Yakima contends specific performance of the remaining term of the Agreement was necessary to fully compensate for the County's breach because the jury only awarded damages attributable to losses suffered by Yakima until it would be able to resume operations and rebuild its business to the level enjoyed before the breach. Yakima fails to point to any evidence that would have supported such a finding, however, and we are unaware of such evidence. Gorman testified that Yakima sustained damages in excess of $12 million in lost future profits and incremental damages as a result of the County's breach of contract. His calculation did not assume Yakima would recommence operations under the Agreement. Moreover, he acknowledged that Yakima had potential future sources of revenue other than Orange County and Los Angeles but stated he did not have sufficient information to calculate lost profits from those sources. Significantly, when asked how long it would take for Yakima to resurrect its business under the Agreement, Willett answered, "I don't know that I could ever do it given the circumstances." Finally, the court instructed the jury that if it finds liability, it must decide the amount of money that would reasonably and fairly compensate the nonbreaching party and "place that party in the position it would have been in if the contract had been performed." No instruction directed the jury to pinpoint damages as of a date other than the last day of the Agreement's term.

¶ 64 In light of this evidence, the trial court did not err by concluding the jury awarded more than $9 million to fully compensate Yakima for the County's breach of the Agreement. It follows, therefore, the court did not abuse its discretion by refusing to order specific performance of the Agreement as doing so would have bestowed a benefit beyond that needed to fulfill Yakima's expectations under the Agreement.

### ATTORNEYS' FEES ON APPEAL

¶ 65 The County and Lincoln both request an award of attorneys' fees on appeal pursuant to A.R.S. § 12–341.01 (2003) and Arizona Rule of Civil Appellate Procedure ("ARCAP") 21. Although the County prevailed against Yakima in the cross-appeal, it did not prevail against Yakima in the appeal, which comprised the bulk of the issues before us. In our discretion, we therefore deny the County's request for attorneys' fees against Yakima. Lincoln prevailed in the appeal. We therefore award it reasonable attorneys' fees and costs against the County subject to Lincoln's compliance with ARCAP 21.

### CONCLUSION

¶ 66 For the foregoing reasons, we affirm as to both the appeal and cross-appeal.

CONCURRING: PETER B. SWANN, Presiding Judge and MICHAEL J. BROWN, Judge.